**No. 24-6376**

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

——————————

MARCH FOR OUR LIVES IDAHO, *et al.*,

*Plaintiffs-Appellants*,

v.

PHIL MCGRANE, in his official capacity as Idaho Secretary of State,

*Defendant-Appellee*.

——————————

On Appeal from the United States District Court
for the District of Idaho
Case No. 1:23-cv-00107-AKB
Hon. Amanda K. Brailsford

——————————

**APPELLANTS' OPENING BRIEF**

——————————

TERRI R. PICKENS
PICKENS LAW, P.A.
398 S. 9th Street, Suite 240
Boise, ID 83702
terri@pickenslawboise.com
(208) 954-5090

DAVID R. FOX
DANIEL J. COHEN
QIZHOU GE
TINA MENG MORRISON
ELIAS LAW GROUP LLP
250 Massachusetts Ave NW, Ste. 400
Washington, D.C. 20001
dfox@elias.law
dcohen@elias.law
age@elias.law
tmengmorrison@elias.law
(202) 968-4490

*Counsel for Plaintiffs-Appellants*

February 7, 2025

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellants March For Our Lives Idaho and Idaho Alliance for Retired Americans have no parent corporations, and there is no corporation that holds 10% of more of either of their stock. A supplemental disclosure statement will be filed upon any change in the information provided herein.


February 7, 2025

DAVID R. FOX
Elias Law Group LLP

*s/ David R. Fox*
David R. Fox

*Counsel for the Plaintiffs-Appellants*

# TABLE OF CONTENTS

Table of Authorities.................................................................................. iii

Introduction.................................................................................................1

Jurisdictional Statement.............................................................................2

Issues Presented .........................................................................................3

Statutory Addendum ...................................................................................4

Statement of the Case.................................................................................4

Standard of Review.....................................................................................7

Summary of the Argument.........................................................................8

Argument...................................................................................................12

    I.    The district court correctly held that MFOL Idaho has standing. ...............12

        A. House Bill 340 and House Bill 124 injure MFOL Idaho as an organization. ...........................................................................13

        B. House Bill 340 and House Bill 124 injure MFOL Idaho's constituents. .............................................................................18

    II.   The Twenty-Sixth Amendment prohibits all age discrimination in voting. ...............................................................................................22

    III.  There is at least a dispute of fact over whether the challenged laws were enacted to discriminate on the basis of age. ..........................30

        A. The district court improperly discounted substantial evidence of discriminatory purpose. .........................................................34

        B. The district court ignored the time-honored relationship between discrimination against students and discrimination against young people..............................................................................42

        C. The district court erred in discounting Plaintiffs' evidence in favor of the legislature's official statement of purpose......................44

Conclusion ................................................................................................47

Certificate of Compliance ........................................................................49

# TABLE OF AUTHORITIES

## CASES

*Allen v. Milligan*,
    599 U.S. 1 (2023) ..........................................................................32

*Am. Unites for Kids v. Rousseau*,
    985 F.3d 1075 (9th Cir. 2021) ......................................................18

*Animal Legal Def. Fund v. FDA*,
    836 F.3d 987 (9th Cir. 2016) ..........................................................8

*Ariz. All. for Retired Ams. v. Mayes*,
    117 F.4th 1165 (9th Cir. 2024) ............................................. *passim*

*Batson v. Kentucky*,
    476 U.S. 79 (1986) ........................................................................45

*City of Mobile v. Bolden*,
    446 U.S. 55 (1980) ................................................. 2, 10, 25, 26, 32

*Coal. on Homelessness v. City & County of San Francisco*,
    No. 22-cv-05502-DMR, 2024 WL 4982989 (N.D. Cal. Dec. 4, 2024) ..........22

*Columbus Bd. of Educ. v. Penick*,
    443 U.S. 449 (1979) ......................................................................33

*Common Cause/Ga. v. Billups*,
    554 F.3d 1340 (11th Cir. 2009) ..................................................9, 19

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008) ......................................................................29

*Dawson v. Entek Int'l*,
    630 F.3d 928 (9th Cir. 2011) ..........................................................7

*Direct Techs., LLC v. Elec. Arts, Inc.*,
    836 F.3d 1059 (9th Cir. 2016) ............................................................7

*Disability L. Ctr. of Alaska v. Meyer*,
    484 F. Supp. 3d 693 (D. Alaska 2020) ...........................................31

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ................................................................ *passim*

*Get Loud Ark. v. Thurston*,
    No. 5:24-cv-5121, 2024 WL 4142754 (W.D. Ark. Sept. 9, 2024) ...................17

*Gonzalez v. Arizona*,
    485 F.3d 1041 (9th Cir. 2007) .........................................................29

*Gonzalez v. Arizona*,
    No. CV 06-1268-PHX-ROS, 2008 WL 11395500 (D. Ariz. June 27, 2008)...19

*Guinn v. United States*,
    238 U.S. 347 (1915) ................................................................11, 26

*Hall v. Hall*,
    584 U.S. 59 (2018) .........................................................................23

*Harman v. Forssenius*,
    380 U.S. 528 ( 1965) .....................................................................30

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ...................................................... 13, 14, 15

*Humane Soc'y of the U.S. v. Hodel*,
    840 F.2d 45 (D.C. Cir. 1988)........................................................20

*Hunt v. Wash. State. Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ...................................................................9, 21

*Jean v. Nelson*,
    711 F.2d 1455 (11th Cir. 1983)............................................... 33, 46

*Koontz v. St. Johns River Water Mgmt. Dist.*,
    570 U.S. 595 (2013) ........................................................................30

*Lane v. Wilson*,
    307 U.S. 268 (1939) ................................................................. *passim*

*Lassiter v. Northampton Cnty. Bd. of Elections*,
    360 U.S. 45 (1959) ...........................................................11, 28, 29

*League of Women Voters of Fla., Inc., v. Detzner*,
    314 F. Supp. 3d 1205 (N.D. Fla. 2018) .................................... *passim*

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) ........................................................................45

*Nat'l Council of La Raza v. Cegavske*,
    800 F.3d 1032 (9th Cir. 2015) ................................................. 10, 21

*Norman v. Reed*,
    502 U.S. 279 (1992) ........................................................................29

*Norris v. Alabama*,
    294 U.S. 587 (1935) ........................................................................46

*One Wis. Inst., Inc. v. Nichol*,
    186 F. Supp. 3d 958 (W.D. Wis. 2016) .................................... 19, 24

*Org. for Black Struggle v. Ashcroft*,
    493 F. Supp. 3d 790 (W.D. Mo. 2020) ..........................................20

*Pac. Shores Props., LLC v. City of Newport Beach*,
    730 F.3d 1142 (9th Cir. 2013) .......................................................33

*Shaw v. Reno*,
    509 U.S. 630 (1993) ........................................................................45

*Shelby County v. Holder*,
    570 U.S. 529 (2013) ........................................................................26

*Smith v. City of Jackson*,
    544 U.S. 228 (2005) ........................................................23

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966) ........................................................26

*Symm v. United States*,
    439 U.S. 1105 (1979) ......................................................44

*Taggart v. Lorenzen*,
    587 U.S. 554 (2019) ........................................................23

*Tolan v. Cotton*,
    572 U.S. 650 (2014) .............................................. 7, 34, 45

*Tully v. Okeson*,
    78 F.4th 377 (7th Cir. 2023) .................... 24, 27, 28, 29, 31

*Tully v. Okeson*,
    977 F.3d 608 (7th Cir. 2020) ..........................................27

*United States v. Bd. of Sch. Comm'rs of City of Indianapolis*,
    573 F.2d 400 (7th Cir. 1978) ............................... 33, 46, 47

*United States v. JP Morgan Chase Bank Acct. No. Ending 8215*,
    835 F.3d 1159 (9th Cir. 2016) ..........................................7

*United States v. Novak*,
    476 F.3d 1041 (9th Cir. 2007) ........................................23

*United States v. Reese*,
    92 U.S. 214 (1875) ..........................................................25

*United States v. Texas*,
    445 F. Supp. 1245 (S.D. Tex. 1978) ...............................44

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ................................. 11, 32, 33, 45

*Walgren v. Howes*,
    482 F.2d 95 (1st Cir. 1973) ................................................... 25, 28, 43

*Walgren v. Howes*,
    519 F.2d 1364 (1st Cir. 1975) .......................................................29

*Worden v. Mercer Cnty. Bd. of Elections*,
    294 A.2d 233 (N.J. 1972) ..............................................................42

*Yu v. Idaho State Univ.*,
    15 F.4th 1236 (9th Cir. 2021) .........................................................7

*Zetwick v. County of Yolo*,
    850 F.3d 436 (9th Cir. 2017) ................................... 7, 34, 35, 44, 45

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I .........................................................................29

U.S. Const. amend. XIV .............................................................. *passim*

U.S. Const. amend. XV ............................................................... *passim*

U.S. Const. amend. XIX .............................................................. *passim*

U.S. Const. amend. XXIV ............................................................ *passim*

U.S. Const. amend. XXVI ............................................................ *passim*

## STATUTES

28 U.S.C. § 1291 ................................................................................2

28 U.S.C. § 1331 ................................................................................3

28 U.S.C. § 1983 ................................................................................3

Idaho Code § 34-408A .......................................................................5

Idaho Code § 34-411(3) ....................................................................5

Idaho Code § 34-1106 ........................................................................32

Idaho Code § 34-1113 .........................................................................4

Idaho Code § 34-1114 .........................................................................5

Idaho Code § 74-604(3) ................................................................. 12, 41

## OTHER AUTHORITIES

117 Cong. Rec. 7533 (1971) ...........................................................24

117 Cong. Rec. 7534 (1971) ...........................................................23

117 Cong. Rec. 7539 (1971) ...........................................................23

Developments in the Law - Voting and Democracy: Voter Identification Laws
    119 Harv. L. Rev. 1144 (2006) ........................................................31

**INTRODUCTION**

Two years ago, the Idaho legislature passed two laws that made it dramatically harder for young Idahoans to register and vote, by (1) requiring every new voter registrant to show photo identification and (2) eliminating student identification as an accepted form of identification for registration and voting. There is every indication that the effect of these laws on young voters was intentional. The legislature that enacted them was specifically interested in the methods of voting used by voters of different ages and expressly solicitous of protecting the methods of voting used by older voters. The opposition to student identification was driven by legislators who represent districts with substantial student populations, and who stood to gain by making it harder for those young voters to vote. And the bills were enacted in the context of a broader backlash to several years of rising youth political engagement in Idaho.

Despite that evidence and more, the district court granted summary judgment for Defendant on Plaintiffs' claim that the challenged laws discriminate against young voters in violation of the Twenty-Sixth Amendment. The district court pointed to the lack of *facial* age discrimination, noting that Idaho law requires all voters to present acceptable identification. But longstanding precedent under the identically worded Fifteenth Amendment makes clear that facial neutrality is not enough: a law "that is racially neutral on its face violates the

1

Fifteenth Amendment . . . if motivated by a discriminatory purpose." *City of Mobile v. Bolden*, 446 U.S. 55, 62 (1980).

The district court also reasoned that prohibiting student identification for voting did not substantially interfere with the right to vote. But the Twenty-Sixth Amendment prohibits age discrimination, not violations of the substantive right to vote. The Supreme Court has held that Fifteenth Amendment claims are grounded in "inequality of treatment though under color of law, not denial of the right to vote." *Lane v. Wilson*, 307 U.S. 268, 274 (1939). The same conclusion follows under the Twenty-Sixth Amendment's identical language.

The district court's approach ignores that the Twenty-Sixth Amendment makes age-discrimination verboten in voting and would reduce the Amendment to a nullity, without any added effect above the Fourteenth Amendment's protection of the substantive right to vote. And while the district court held in the alternative that Plaintiffs offered too little evidence of purposeful age discrimination, that holding failed to credit Plaintiffs' evidence and draw all reasonable inference in their favor, as the law requires at summary judgment.

The Court should reverse.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over this appeal under 28 U.S.C. § 1291, as an appeal from a final judgment of the U.S. District Court for the District of Idaho.

The district court had jurisdiction under 28 U.S.C. § 1331, as a civil action arising under federal law—specifically, the Fourteenth, Twenty-Fourth, and Twenty-Sixth Amendments to the U.S. Constitution, and 28 U.S.C. § 1983. The district court entered final judgment on all claims by all parties on September 17, 2024, and Plaintiffs-Appellants timely filed their Notice of Appeal on October 16, 2024.

## ISSUES PRESENTED

1.      Whether the Twenty-Sixth Amendment to the U.S. Constitution prohibits purposeful age discrimination in voting procedures, by providing that "the right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age."

2.      Whether the district court erred in holding that there was no dispute of material fact over whether House Bill 124 and House Bill 340 purposefully discriminate against young voters by prohibiting the use of student identification for voter registration and voting, despite record evidence showing that the enacting legislature reviewed information on voting methods by age and avoided limiting methods used mostly by older voters, that the bills have a clear disparate impact on young voters, and that the bills were passed in the context of a legislative backlash to rising youth activism in Idaho.

3

## STATUTORY ADDENDUM

Plaintiffs' statutory addendum includes the relevant constitutional and statutory provisions.

## STATEMENT OF THE CASE

Two years ago, the Idaho legislature enacted two bills that made it more difficult for young people to register to vote and vote.

The first, House Bill 124, eliminated student identification as an acceptable form of voter identification for in-person voting. Idaho first imposed a voter identification requirement for in-person voting in 2010. 2010 Idaho Laws, ch. 246 (H.B. 496), § 2 (codified as amended at Idaho Code § 34-1113). From the start, student identification was a permitted form of voter identification. House Bill 124 changed that, amending Idaho Code § 34-1113 to provide that voters must present one of the following four forms of identification "before voting at the polls":

> (1) An Idaho driver's license or identification card issued by the Idaho transportation department;
> (2) A passport or an identification card, including a photograph, issued by an agency of the United States government;
> (3) A tribal identification card, including a photograph; or
> (4) A license to carry concealed weapons issued under section 18-3302, Idaho Code, or an enhanced license to carry concealed weapons issued under section 18-3302K, Idaho Code.

*Id.*

4

The second bill, House Bill 340, applies to voter *registration*—a necessary prerequisite to voting in Idaho. House Bill 340 mandates that everyone *registering* to vote must show one of the same four forms of acceptable photo identification that amended Section 34-1113 requires for in-person voting. *See id.* § 34-411(3). By doing so, House Bill 340 eliminates longstanding alternative ways of proving identity and residence when registering; for example, students could previously register in person with their student identification and a fee statement. *See id.* § 34-408A (2022).

As a result, no one may now register to vote unless they have and present one of the four limited forms of accepted photo identification. Voters who are already registered, however, have a fallback: Idaho Code § 34-1114 allows already registered voters to "complete an affidavit in lieu of the personal identification" requirement. The legislature that enacted House Bill 124 and House Bill 340 considered eliminating the affidavit fallback as well but ultimately rejected a bill that would have done so after the Secretary of State requested and obtained data showing voters' use of the affidavits by age, which revealed that—unlike student identification—the affidavits were primarily used by older, not younger, voters. *See* ER-72:18–73:1, -79–80, -85:14–24.

Plaintiffs March For Our Lives Idaho ("MFOL Idaho") and the Idaho Alliance for Retired Americans (the "Alliance") challenged House Bill 124 and

House Bill 340 on three grounds: (1) as a violation of the Twenty-Sixth
Amendment for denying or abridging the right to vote based on age, (2) as a
violation of the Twenty-Fourth Amendment and Equal Protection Clause of the
Fourteenth Amendment as an unconstitutional poll tax, and (3) as a violation of the
Equal Protection Clause due to unconstitutional discrimination against new
registrants. On September 17, 2024, the district court granted Defendant's motion
for summary judgment on all three claims. ER-3. Plaintiffs appeal only from the
district court's grant of summary judgment on Plaintiffs' first claim—that the
challenged laws violate the Twenty-Sixth Amendment because prohibiting the use
of student identification for registration and voting discriminates against young
voters based on their age.

     In its summary judgment ruling, the district court first rejected Defendants'
argument that Plaintiffs lack standing, holding that MFOL Idaho has organizational
standing even considering the Supreme Court's recent decision in *FDA v. Alliance
for Hippocratic Medicine*, 602 U.S. 367 (2024). The court explained that MFOL
Idaho "has submitted evidence showing it is in the 'business' of educating and
registering voters—not merely gathering information and advocating against the
law," and that "Idaho's amended voter laws have increased its costs for its core
activities of educating and registering voters." ER-14. But the district court went
on to grant Defendant summary judgment on the merits. With respect to Plaintiffs'

Twenty-Sixth Amendment claim, the district court reasoned that the challenged laws do not facially discriminate based on age because they "require[] everyone to present some form of acceptable identification[.]" ER-18–19. The court therefore held that the challenged laws "impose[] no 'material requirement' on younger voters solely on account of age." ER-18. In the alternative, the court held that Plaintiffs submitted too little evidence of purposeful age discrimination to survive summary judgment. ER-19–21. Plaintiffs timely appealed. ER-139–42.

## STANDARD OF REVIEW

The district court's conclusions of law are reviewed *de novo*, *Yu v. Idaho State Univ.*, 15 F.4th 1236, 1242 (9th Cir. 2021), as is its grant of summary judgment, *Dawson v. Entek Int'l*, 630 F.3d 928, 934 (9th Cir. 2011). "Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact." *Zetwick v. County of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017) (quoting *United States v. JP Morgan Chase Bank Acct. No. Ending 8215*, 835 F.3d 1159, 1169 (9th Cir. 2016). "[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* at 441 (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)) (alteration in original). "[W]here evidence is genuinely disputed on a particular issue . . . that 'issue is inappropriate for resolution on summary judgment.'" *Id.* (quoting *Direct Techs., LLC v. Elec. Arts, Inc.*, 836 F.3d 1059,

1067 (9th Cir. 2016)). And "where the district court has made a factual determination, summary judgment cannot be appropriate." *Id.* (quoting *Animal Legal Def. Fund v. FDA*, 836 F.3d 987, 990 (9th Cir. 2016)).

## SUMMARY OF THE ARGUMENT

**I.A.** MFOL Idaho has organizational standing because the challenged laws "directly affect [MFOL Idaho's] pre-existing core activities" to MFOL Idaho's detriment. *Ariz. All. for Retired Ams. v. Mayes*, 117 F.4th 1165, 1178 (9th Cir. 2024) (citing *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 396 (2024)), *pet. for reh'g en banc pending*. MFOL Idaho is a youth-led organization, with the mission of "harness[ing] the power of young people to fight for common sense solutions to end gun violence in Idaho." ER-100 ¶ 2. To achieve that mission, MFOL Idaho "conducts voter registration, turnout, and education activities" that are specifically focused on registering and turning out young voters to vote in Idaho, primarily high school and college students. *Id.* ¶ 5; *see also* ER-101 ¶ 6.

By precluding the use of student identification to register to vote and to vote, the challenged laws make it harder for MFOL Idaho to help its high school and college student constituents register to vote and vote. The high school and college students that MFOL Idaho works to register and turn out to vote have ready access to student identification, but they may not have access to other forms of identification. *See* ER-100–103 ¶¶ 2–10, 16. For that reason, the direct effect of the

8

challenged laws is to make it harder for MFOL Idaho to accomplish its core voter-registration and turnout activities, forcing MFOL Idaho to divert its limited time from common-sense gun reform advocacy to helping its constituents obtain an acceptable form of identification. *E.g.*, ER-101–03 ¶¶ 9–13, 16–17.

**I.B.** MFOL Idaho also has associational standing because the challenged laws injure its constituents by making it harder for them to vote. Being required to show voter identification constitutes injury-in-fact, even if a voter possesses the identification or is eligible to obtain it. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009). And regardless, some of MFOL Idaho's constituents do not have a driver's license, passport, or other acceptable form of identification. ER-101 ¶ 6. Before the enactment of the challenged laws, those constituents could have used their student identification to register and vote, but the new laws remove that option. Those constituents would have standing to sue in their own right. *Common Cause/Ga.*, 554 F.3d at 1351–52. And MFOL Idaho has standing to sue as their representative because protecting its constituents' ability to register and to vote is central to MFOL Idaho's organizational purpose of registering and turning out young voters to build and amplify the youth political voice. ER-100, -102–03 ¶¶ 2, 5, 16; *see Hunt v. Wash. State. Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977). And because it "is relatively clear, rather than merely speculative, that one or more members have been or will be adversely

9

affected by" the challenged laws, MFOL Idaho was not required to "identify by name the member or members injured." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015), *overruled on other grounds*, *Mayes*, 117 F.4th at 1177–78.

**II.** On the merits, the district court erred by rejecting a purposeful discrimination analysis of Plaintiffs' Twenty-Sixth Amendment claim. ER-18–19. The Twenty-Sixth Amendment prohibits age discrimination in voting. *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1221 (N.D. Fla. 2018). Its language—providing that the right to vote "shall not be denied or abridged [] on account of age"—mirrors and was expressly modeled after the Fifteenth, Nineteenth, and Twenty-Fourth Amendments, which protect against race-discriminatory, sex-discriminatory, and tax-based voting restrictions, respectively. And the Supreme Court has long held that the Fifteenth Amendment prohibits even "racially neutral" election laws "if motivated by a discriminatory purpose." *City of Mobile*, 446 U.S. at 62.

The Twenty-Sixth Amendment's identical language demands the same approach. Yet the district court improperly jettisoned it, holding instead that the challenged laws do not violate the Twenty-Sixth Amendment because the elimination of student identification for registration and voting applies to all voters and does not facially discriminate on the basis of age. ER-18–19. That reasoning is

irreconcilable with a long line of Fifteenth Amendment cases striking down facially race-neutral laws. *See, e.g.*, *Lane*, 307 U.S. at 275; *Guinn v. United States*, 238 U.S. 347, 364–65 (1915).

The district court also seemed to conclude that the elimination of student identification was too minor an interference with voting to violate the constitutionally protected right to vote. ER-18–19. But that reasoning conflates the Twenty-Sixth Amendment's prohibition on *discrimination* with the Fourteenth Amendment's substantive protection of voting itself, and it ignores that voting laws that might otherwise be constitutional become unconstitutional if they are "employed to perpetuate that discrimination which" the voting amendments were "designed to uproot." *Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 53 (1959) (Fifteenth Amendment).

**III.** Finally, in holding in the alternative that Plaintiffs offered too little evidence of age discrimination to survive summary judgment, the district court failed to fully consider all "circumstantial and direct evidence of intent as may be available" to determine whether an intent to discriminate based on age was a "motivating factor" in the challenged laws. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). The record raises, at minimum, a material dispute of fact over whether the challenged laws were enacted with the intent to discriminate against young voters.

11

The record includes direct evidence that the enacting legislature asked about the age of voters using particular methods of voting and avoided eliminating methods favored by older voters. It shows that young voters were *35 times* more likely to use student identification than older voters. ER-55–56; ER-107–08. It shows significant irregularities in the legislative process, in which broader election legislation favored by the Secretary of State was held hostage until the elimination of student identification was enacted and signed. ER-69:24–70:25. And it shows that the challenged laws were only the latest salvo in a years-long crusade by the Idaho legislature to suppress rising youth political engagement. *See, e.g.*, Idaho Code § 74-604(3) (2021); ER-49–51, -77. All of this evidence, and the reasonable inferences that may be drawn from it, at a minimum shows a dispute of material fact over whether the challenged laws were enacted with the purpose of discriminating against young voters.

## ARGUMENT

**I.    The district court correctly held that MFOL Idaho has standing.**

The district court correctly held that MFOL Idaho has Article III standing. ER-14. The challenged laws injure MFOL Idaho as an organization by perceptibly impairing its core voter registration and mobilization activities, and they injure MFOL Idaho's constituents by making it harder for them to register and vote.

## A.   House Bill 340 and House Bill 124 injure MFOL Idaho as an organization.

The district court correctly held that MFOL Idaho has standing to challenge the constitutionality of House Bill 340 and House Bill 124 because they injure MFOL Idaho as an organization. To demonstrate organizational standing, an organizational plaintiff must satisfy "the traditional three-part Article III standing analysis: (1) injury-in-fact, (2) causation, and (3) redressability." *Mayes*, 117 F.4th at 1178. To show injury-in-fact, the plaintiff must show that the challenged conduct "directly affect[s] their pre-existing core activities." *Id.* (citing *All. for Hippocratic Med.*, 602 U.S. at 396); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 365 (1982) (holding organizational plaintiff suffered injury-in-fact when challenged conduct "perceptibly impaired" organization's ability to conduct core activities and drained resources).

At summary judgment, the district court correctly concluded that MFOL Idaho had shown "sufficient injury—primarily in the form [of] diverting time, talent, and resources to educate their voters and implementing stricter registration requirements—to establish organizational standing." ER-12. As MFOL Idaho's co-director testified in her declaration, the challenged laws "make[] it harder for [MFOL Idaho's] constituents to register and vote and harder for [MFOL Idaho] to successfully register and turn them out to vote." *Id.*; *see also* ER-100–03 ¶¶ 2–3, 12, 16. The co-director explained that the new photo identification requirement for

13

registration and the removal of student identification as an acceptable form of voter identification meant that many of MFOL Idaho's high school and college student constituents could no longer use the form of identification most readily available to them. ER-101 ¶¶ 6–7, 10. These students also have trouble accessing other required identification documents. *Id.* Consequently, the challenged laws force MFOL Idaho to spend its limited time and resources creating new voter education materials and re-training volunteers to educate constituents about the new voter registration requirements, reaching out to DMV offices for guidance about other forms of alternative identification, and helping constituents obtain acceptable identification (including driving them to the DMV and helping pay for the cost of a new identification card). ER-101–03 ¶¶ 9, 12–13, 17. The district court found that this impairment satisfied the "minimal showing of injury" required for organizational standing. ER-12–13.

The district court reached this conclusion before this Court's recent decision in *Mayes*, but *Mayes* does not call it into doubt. The decision in *Mayes* was based on the Supreme Court's decision in *Hippocratic Medicine*—which itself simply reiterated the well-established standard for organizational standing set forth by that Court over 40 years ago in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 365 (1982). *All. for Hippocratic Med.*, 602 U.S. at 393–94. As the Supreme Court has consistently held from *Havens* to *Hippocratic Medicine*, organizational plaintiffs

14

must meet traditional Article III standing requirements to proceed in federal court on their own behalf. *See id.* (citing *Havens*, 455 U.S. at 378–79). *Mayes* interpreted this to mean organizational plaintiffs must "plead facts showing that their core activities are directly affected by the defendant's conduct," doing more than "merely claim[ing] that [the challenged] law caused them to spend money in response to it—they must show that [defendant's] actions directly harmed already-existing activities." 117 F.4th at 1172.

MFOL Idaho easily satisfies that standard. As the district court held, MFOL Idaho has shown that the challenged laws directly impair its core activities by making it harder for MFOL Idaho to help its high school and college student constituents register to vote and vote, a central part of MFOL Idaho's mission. ER-12–13, -36:10–37:12. Under the challenged laws, MFOL Idaho's constituents are no longer able to even *register*—much less vote—unless they obtain and present specific forms of photo identification that they are less likely than older voters to have, and they are now prohibited from using their student identification (which they are far more likely than older voters to have) for that purpose. That effect is not "far-fetched possibility," it does not require "mistaken[] or malicious[]" action by anyone, and it does not depend on "speculation about the unfettered choices made by independent actors not before the courts," "assume that third parties will act in unpredictable or irrational ways," or "rely on distant (even if predictable)

ripple effects." *Mayes*, 117 F.4th at 1180 (cleaned up). Rather, MFOL Idaho's injury is the direct and intended effect of the challenged laws' elimination of student identification for registration and voting.

As the district court expressly recognized, the Supreme Court's decision in *Hippocratic Medicine* does not suggest a different conclusion. 602 U.S. at 367. The plaintiffs in *Hippocratic Medicine* challenged regulations authorizing (but not requiring) the prescription of mifepristone, a drug that plaintiffs did not prescribe or use. *Id.* at 386–90. The plaintiffs therefore were not directly regulated by the approval of mifepristone in any way. *Id.* at 386–90. The Supreme Court unsurprisingly held that the plaintiffs had no standing to challenge rules that did not regulate them, and that the plaintiffs' "injuries" from their voluntary choice to take actions advocating against the use of mifepristone were self-inflicted and did not provide standing. *Id.* at 394–95. As the Court explained, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394.

As the district court correctly recognized, that straightforward holding does not negate MFOL Idaho's standing here, because MFOL Idaho does "suffer[] a concrete injury caused by" the challenged laws, *id.*—the challenged laws directly change the process in which MFOL Idaho can register voters and make it

16

concretely harder for MFOL Idaho to register and turn out young voters. *See* ER-13–14; *Get Loud Ark. v. Thurston*, No. 5:24-cv-5121, 2024 WL 4142754, at *13 (W.D. Ark. Sept. 9, 2024) (holding that voter registration groups have standing to challenge regulations that directly affect and interfere with their activities). As MFOL Idaho's co-director explained, the organization's mission includes registering, engaging, and turning out young voters to build and amplify the youth political voice on key issues such as common-sense measures to address gun violence. ER-100–03 ¶¶ 2, 5, 16. Based on this evidence, the district court correctly determined that MFOL Idaho "is in the 'business' of educating and registering voters—not merely gathering information and advocating against the law." ER-14. And the challenged laws make it harder for MFOL Idaho to engage in its core activities of educating, registering, and turning out voters by precluding the use of student identification for registration and voting. ER-100–03 ¶¶ 2–3, 6–7, 10, 16.

In short, MFOL Idaho is not merely "spend[ing] its way into standing simply by expending money to gather information and advocate against the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 394–95. It did not, for example, assert standing based on any lobbying activities against House Bill 124 and House Bill 340 or on expenses incurred in efforts to repeal the bills. Rather, MFOL Idaho diverted resources in response to real, direct harms that the challenged laws impose

on its ability to engage in key activities to advance its mission. No more is required for standing.

### B.  House Bill 340 and House Bill 124 injure MFOL Idaho's constituents.

Although the district court's summary judgment ruling relied on its finding of organizational standing, *see* ER-10–14, the record also shows that MFOL Idaho has associational standing, which provides an entirely independent basis for standing. An organization has associational standing when: "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096 (9th Cir. 2021). Members, for this purpose, include "a 'specialized segment' of the community that is the 'primary beneficiary'" of the organization's activities. *Id.* at 1097. MFOL Idaho satisfies each of these requirements.

First, MFOL Idaho has many constituents who would have standing to challenge the new laws in their own right. MFOL Idaho serves a specialized segment of the community made up of young Idahoans concerned about gun violence. ER-100 ¶ 2. Many of those constituents are high school and college students who have student identification. ER-101 ¶ 6. The challenged laws injure those constituents by requiring them to obtain and show some *other* form of

18

accepted identification to register to vote or vote. Courts have consistently held that voters have standing to challenge voter identification requirements, regardless of whether they have the required identification and regardless of the relative burden imposed by the identification requirement. *See, e.g.*, *Common Cause/Ga.*, 554 F.3d at 1351–52 (holding that when individual voter plaintiffs "are required to obtain photo identification before they can vote, . . . the imposition of that burden is an injury sufficient to confer standing regardless of whether [they] are able to obtain photo identification"); *One Wis. Inst., Inc. v. Nichol*, 186 F. Supp. 3d 958, 966 (W.D. Wis. 2016) (holding individual voters had standing to challenge voter identification law, reasoning that "IDs expire, meaning that the individual voters who currently have IDs will eventually have to renew them or acquire new forms of acceptable identification"); *Gonzalez v. Arizona*, No. CV 06-1268-PHX-ROS, 2008 WL 11395500, at *4–*5 (D. Ariz. June 27, 2008) (holding individual voters had standing to challenge identification requirement because "[t]he fact that the cost and inconvenience may be slight does not affect standing, which requires only a minimal showing of injury"). This case is no different.

Moreover, at least some of MFOL Idaho's constituents previously relied on their student identification to register and vote and do not have any of the forms of identification that are now accepted. ER-101 ¶ 6. The harm caused by the challenged laws is exacerbated by the fact that many of MFOL Idaho's constituents

will face difficulty obtaining one of the required forms of identification, whether due to lack of access to supporting residency documents, lack of transportation to visit the Department of Motor Vehicles, lack of eligibility, lack of knowledge, or lack of time. *See* ER-101–02 ¶¶ 6–10, 13–14; *see also* ER-54 ("[T]he literature uniformly finds that the burdens of photo ID laws fall most heavily on minorities, the young, and the elderly, who are less likely to possess a driver's license or state-issued photo ID."). Thus, the challenged laws make it harder for MFOL Idaho's constituents to register and vote, which would give them standing to sue in their own right.

Second, MFOL Idaho seeks to protect interests germane to its organizational purpose. This is an "undemanding" prong for which courts generally require "mere pertinence between litigation subject and organizational purpose." *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 58–59 (D.C. Cir. 1988) (collecting cases). Plaintiffs challenge two bills that are designed to, and have the effect of, suppressing the voting power of youth voters across Idaho—*the* demographic group at the center of MFOL Idaho's constituency. Because MFOL Idaho's mission includes promoting voter registration and voting among their constituents through education and engagement efforts, this lawsuit unmistakably protects the very interests that are at the heart of MFOL Idaho's organizational purpose. *See*, *e.g.*, ER-101 ¶ 10; *cf. Org. for Black Struggle v. Ashcroft*, 493 F. Supp. 3d 790, 799

(W.D. Mo. 2020) (holding plaintiff organizations had associational standing to challenge mail-in voting statute because "[p]laintiffs' alleged missions and community roles relate to voter registration and education, and/or the protection of the right to vote" and "a decision favorable to [p]laintiffs will accrue to the benefit of [p]laintiffs' members and the constituencies they serve").

Finally, the participation of individual members is not required here because Plaintiffs seek only declaratory and injunctive relief based on a facial challenge to HB 124 and HB 340, and such claims for relief do not require individualized proof and are "thus properly resolved in a group context" where organizations litigate issues on behalf of its members and constituents. *See* ER-136–37; *Hunt*, 432 U.S. at 344.

To show associational standing, MFOL Idaho need not identify a specific member who has been harmed by the challenged laws. As this Court has explained:

> Where it is relatively clear, rather than merely
> speculative, that one or more members have been or will
> be adversely affected by a defendant's action, and where
> the defendant need not know the identity of a particular
> member to understand and respond to an organization's
> claim of injury, we see no purpose to be served by
> requiring an organization to identify by name the member
> or members injured.

*Nat'l Council of La Raza*, 800 F.3d at 1041. Here, it is more than "relatively clear" that MFOL Idaho's members and constituents will be harmed by the challenged laws: they must now show a specific form of photo identification to register and

21

vote, and may no longer use their student identification. *See supra* at 11–12. And while *Mayes* said that it overruled *La Raza*'s organizational standing analysis, it said nothing about this portion of *La Raza. See Mayes*, 117 F.4th at 1177–78 (overruling the "frustration-of-mission and diversion-of-resource theories" in *La Raza* without mentioning *Summers*, or the requirement to specifically identify an injured member); *see also, e.g.*, *Coal. on Homelessness v. City & County of San Francisco*, No. 22-cv-05502-DMR, 2024 WL 4982989, at *6 (N.D. Cal. Dec. 4, 2024) (applying *La Raza* in holding that specific identification of an injured member was not necessary to establish associational standing).

For all these reasons, MFOL Idaho has associational standing, which is a sufficient and independent basis to find, as the district court did, that Plaintiffs have Article III standing.

## II.  The Twenty-Sixth Amendment prohibits all age discrimination in voting.

The Twenty-Sixth Amendment provides that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote, shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI, § 1. This language exactly mirrors the language of the earlier-enacted Fifteenth, Nineteenth, and Twenty-Fourth Amendments, which provide that the right to vote "shall not be denied or abridged by the United States or by

any State on account of" race, sex, and failure to pay any poll tax or other tax, respectively. U.S. Const. amends. XV, § 1; XIX; XXIV, § 1.

The Twenty-Sixth Amendment should therefore be interpreted as imposing the same type and level of protection against age-discriminatory voting restrictions that the Fifteenth, Nineteenth, and Twenty-Fourth Amendments provide against race-discriminatory, sex-discriminatory, and tax-based voting restrictions. After all, when a term is "'obviously transplanted from another legal source,' it 'brings the old soil with it.'" *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) (quoting *Hall v. Hall*, 584 U.S. 59, 73 (2018)). All of these amendments were drafted by Congress, and "when Congress uses the same language in two statutes having similar purposes . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005); *see also United States v. Novak*, 476 F.3d 1041, 1051 (9th Cir. 2007) (en banc) ("[C]ourts generally interpret similar language in different statutes in a like manner when the two statutes address a similar subject matter.").

Moreover, the drafters and proponents of the Twenty-Sixth Amendment expressly stated that their goal was to do "exactly what [they] did in . . . the 15th amendment and . . . the 19th amendment." 117 Cong. Rec. 7539 (1971) (statement of Rep. Claude Pepper); *see also id.* at 7534 (statement of Rep. Richard Poff) ("Just as the 15th amendment prohibits racial discrimination in voting and just as

23

the 19th amendment prohibits sex discrimination in voting, the proposed
amendment would prohibit age discrimination in voting"); *id.* at 7533 (statement of
Rep. Emanuel Celler) (explaining that the Twenty-Sixth Amendment "is modeled
after similar provisions in the 15th amendment, which outlawed racial
discrimination at the polls, and the 19th amendment, which enfranchised
women."). And they explained that the Twenty-Sixth Amendment was intended to
ensure "not [only the] grant [of] the right to vote to all citizens 18 years of age or
older," but the broader "guarantee[] that citizens who are 18 years of age or older
*shall not be discriminated against on account of age*." *Id.* at 7534 (statement of
Rep. Richard Poff) (emphasis added). The drafters of the Twenty-Sixth
Amendment therefore indicated their intent that "the proposed amendment would
protect not only an 18-year-old, but also the 88-year-old." *Id.*

      Consistent with this approach, courts have repeatedly recognized the textual
similarity between the Twenty-Sixth Amendment and the Fifteenth Amendment
and held that the understanding of the Fifteenth Amendment should therefore guide
the interpretation of the Twenty-Sixth Amendment. *See, e.g.*, *Tully v. Okeson*, 78
F.4th 377, 382 (7th Cir. 2023) ("*Tully II*"); *One Wis. Inst., Inc.*, 186 F. Supp. 3d at
976 ("[T]he text of the amendment is virtually identical to the text of the Fifteenth
Amendment. The textual and structural similarities suggest that the *Arlington
Heights* framework is the appropriate mechanism for evaluating plaintiffs' age

discrimination claims."); *Walgren v. Howes*, 482 F.2d 95, 101 (1st Cir. 1973)

("*Walgren I*") ("[B]oth the Fifteenth and Nineteenth Amendments served as models

for the Twenty-Sixth."); *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1221

(agreeing with other courts that the Twenty-Sixth Amendment text is "patterned on

the Fifteenth Amendment" and should therefore follow the same intentional

discrimination analysis). And the Supreme Court has been clear about what the

Fifteenth Amendment provides: "*exemption* from discrimination in the exercise of

the elective franchise on account of race, color, or previous condition of servitude."

*City of Mobile*, 446 U.S. at 62 (emphasis added) (quoting *United States v. Reese*,

92 U.S. 214, 217–18 (1875)); *see also Lane*, 307 U.S. at 274 ("The Fifteenth

Amendment secures freedom from discrimination on account of race in matters

affecting the franchise."). In addition, the Fifteenth Amendment prohibits not only

facial race discrimination but also voting-related "action by a State that is racially

neutral on its face . . . if motivated by a discriminatory purpose." *Bolden*, 446 U.S.

at 62.

     The district court's analysis of the Twenty-Sixth Amendment claim was

inconsistent with this settled approach. The court reasoned that "eliminating the

use of student identification cards [by] *all* voters imposes no 'material requirement'

on younger voters solely on account of age," because "everyone [must] present

some form of acceptable identification" and "[s]tudents, like all voters," may use

any of the accepted forms. ER-18–19. This, however, is just an argument that the law does not *facially* discriminate based on age. That does not make it constitutional. The grandfather clauses that the Supreme Court held unconstitutional under the Fifteenth Amendment in *Guinn* and *Lane* did not facially discriminate, either—they set forth facially race-neutral voter registration rules based on voting history or prior eligibility. *See Lane*, 307 U.S. at 271; *Guinn*, 238 U.S. at 357. But as those cases show, and as the Supreme Court explained in *Bolden*, a law "that is racially neutral on its face violates the Fifteenth Amendment . . . if motivated by a discriminatory purpose." *Bolden*, 446 U.S. at 62. In this way, "[t]he Amendment nullifies sophisticated as well as simple-minded modes of discrimination." *Lane*, 307 U.S. at 275. It "has repeatedly been construed, without further legislative specification, to invalidate state voting qualifications or procedures which are discriminatory on their face *or in practice*." *South Carolina v. Katzenbach*, 383 U.S. 301, 325 (1966) (emphasis added), *overruled on other grounds*, *Shelby County v. Holder*, 570 U.S. 529 (2013). The district court's reliance on the challenged laws' facial age neutrality is irreconcilable with that settled approach under the Fifteenth Amendment's materially identical text. *See also League of Women Voters of Fla.*, 314 F. Supp. 3d at 1222 (finding a "stark pattern of discrimination" from a state action that is "unexplainable on grounds

other than age because it bears so heavily on younger voters than all other voters" even when it "appears neutral on its face.").

The district court also seems to have reasoned that the elimination of student identification was too minor of an interference with voting to give rise to a Twenty-Sixth Amendment claim. ER-18–19. In so holding, the district court relied on the Seventh Circuit's decision in *Tully II*, 78 F.4th 377. Despite agreeing that the Fifteenth Amendment was a model for the Twenty-Sixth, *Tully II* upheld a facially age-discriminatory Indiana law that allowed all senior citizens to cast no-excuse absentee ballots while allowing younger citizens to vote absentee only if they showed they could not vote in person due to work, illness, absence from the county on election day. 78 F.4th at 387. *Tully II* concluded that this facial age discrimination did not raise any issues under the Twenty-Sixth Amendment because having to vote in person imposed no "unconstitutional burden" on young voters' right to vote. *Id.* Extending this reasoning to the Fifteenth and Nineteenth Amendment contexts, *Tully II* would apparently uphold, under those Amendments, laws that allow only white men to cast absentee ballots, on the theory that other citizens could still exercise their right to vote by appearing in person.[1] *Tully II*

---

[1] In fact, in *Tully v. Okeson*, 977 F.3d 608, 614 (7th Cir. 2020) ("*Tully I*"), a prior appeal from the denial of a preliminary injunction in the same case, the Seventh Circuit expressly held that "laws similarly restricting the ability of African Americans or women or the poor to vote by mail" would not violate the Fifteenth, Nineteenth, or Twenty-Fourth Amendments "because [they] do not implicate the right to vote." *Tully II* held that it was not bound by the *Tully I* decision, but it

27

based this holding on a narrow reading of the "right to vote" as protecting only

"the *effective* exercise of the franchise" in some manner or other, and not the right

to use particular procedures to cast a ballot. *Tully II*, 78 F.4th at 384.

This aspect of *Tully II*, however, is inconsistent with Supreme Court

precedent, and this Court should not follow it. The Supreme Court has explained

that actions for violations of the identically-worded Fifteenth Amendment are

grounded in "inequality of treatment though under color of law, not denial of the

right to vote." *Lane*, 307 U.S. at 274. As the First Circuit put it shortly after the

Twenty-Sixth Amendment's enactment, the voting amendments are therefore best

understood "to have made the specially protected groups, at least for voting-related

purposes, akin to a 'suspect class[.]'" *Walgren I*, 482 F.2d at 102. As a result,

voting restrictions that would otherwise be constitutional become unconstitutional

if they are adopted or applied with a purpose and effect of discriminating based on

race, sex, age, or payment of a tax. The Supreme Court has held, for example, that

literacy tests are constitutional in the abstract, but that they become

unconstitutional if they are "employed to perpetuate that discrimination which the

Fifteenth Amendment was designed to uproot." *Lassiter*, 360 U.S. at 53. Thus, the

mere fact that a literacy test might not violate the "right to vote" in the abstract

---

offered no explanation for why this same conclusion does not equally follow from *Tully II*'s
reasoning. *See Tully II*, 78 F.4th at 380–82.

28

does not insulate it from review if it is adopted for a discriminatory purpose. *See id.* And that same rule should apply equally to age-discriminatory laws under the Twenty-Sixth Amendment's identical language.

Were it otherwise, the voting amendments would add little or nothing to the protections of the substantive right to vote that the First and Fourteenth Amendments already provide. Even voting laws that do not discriminate based on race, sex, age, or payment of a tax must be "justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (plurality op.) (quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)). *Tully II*'s reasoning that the age-based limitation at issue there was the product of a "sound legislative judgment that [the elderly] encounter special barriers in exercising their right to vote" might suffice for purposes of that analysis. *Tully II*, 78 F.4th at 387. But that is just the First and Fourteenth Amendment test. *See, e.g.*, *Gonzalez v. Arizona*, 485 F.3d 1041, 1049 (9th Cir. 2007). It ignores that the Twenty-Sixth Amendment specifically forecloses age discrimination in voting. As the First Circuit has explained, "[i]t is difficult to believe that [the Twenty-Sixth Amendment] contributes no added protection to that already offered by the Fourteenth Amendment." *Walgren v. Howes*, 519 F.2d 1364, 1367 (1st Cir. 1975) ("*Walgren II*"). That a voting restriction may be rational is no answer to the separate, specific prohibition imposed by the Twenty-Sixth

29

Amendment—a prohibition on "inequality of treatment though under color of law" on the basis of age. *Lane*, 307 U.S. at 374.

The Supreme Court's statement in *Harman v. Forssenius* that the Twenty-Fourth Amendment bars "impos[ing] a material requirement solely upon those who refuse to surrender their constitutional right to vote in federal elections without paying a poll tax" does not support the district court's reasoning, either. 380 U.S. 528, 541 (1965). That language does not say that only *material* violations of the voting amendments—say, *large* poll taxes—are unconstitutional. To the contrary, the poll tax held unconstitutional in *Harman* was just $1.50 per year, which even in 1965 was not much. *Id.* at 531–32. This part of *Harman* was concerned instead with what is today called the unconstitutional conditions doctrine—the "overarching principle . . . that vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). *Harman* in this passage was explaining, in particular, that the Twenty-Fourth Amendment's poll tax prohibition also prohibits states from penalizing people who refused to pay a poll tax by making it harder for them to vote. *Harman*, 380 U.S. at 541. Nothing about that holding suggests that the Fifteenth, Nineteenth, and Twenty-Fourth Amendments prohibit only discrimination in voting that *also* poses such a material

30

barrier to voting as to violate the Constitution's substantive protections of the right to vote itself.

Finally, *Tully II* is, in any event, distinguishable from this case. *Tully II* emphasized both that the challenged law in that case involved absentee voting, which the Seventh Circuit has held is unprotected by the right to vote, and that it extended a new right to the elderly rather than taking something away. 78 F.4th at 383–84, 387; *see also Disability L. Ctr. of Alaska v. Meyer*, 484 F. Supp. 3d 693, 706 (D. Alaska 2020) (holding that "sending paper ballot applications to older voters" does not "impede the present ability of voters under age sixty-five to apply for a vote-by-mail ballot"), *appeal dismissed as moot*, 857 F. App'x 284 (9th Cir. 2021). In contrast, the challenged laws in this case apply to all forms of voting, including in-person voting, and they make it harder to vote by eliminating a previously accepted form of identification. And it cannot be said in this case, unlike in *Tully II*, that the resulting burdens on young voters were commonplace when the Twenty-Sixth Amendment was enacted, because voter identification requirements did not become common until this century, and Idaho did not adopt one until 2010. *See Developments in the Law - Voting and Democracy: Voter Identification Laws*, 119 Harv. L. Rev. 1144, 1148 (2006) (explaining that many states did not consider requiring voter identification until after the enactment of the

31

Help America Vote Act in 2002); H.B. 496, 2010 Idaho Laws ch. 246 (codified as amended at Idaho Code §§ 34-1106–13).

The district court therefore erred by rejecting a purposeful discrimination analysis and instead upholding the challenged laws based on either a lack of facial age discrimination or a perceived lack of a material burden on the fundamental right to vote. The proper analysis should focus instead on age discrimination and determine whether the challenged laws were "motivated by a discriminatory purpose" in violation of the Twenty-Sixth Amendment. *Bolden*, 446 U.S. at 62.

## III. There is at least a dispute of fact over whether the challenged laws were enacted to discriminate on the basis of age.

The proper framework for assessing purposeful discrimination is well-established. Courts must consider all "circumstantial and direct evidence of intent as may be available" to determine whether an intent to discriminate was a "motivating factor" in the challenged action, *Vill. of Arlington Heights*, 429 U.S. at 265–66. It is not necessary to show that the intent to discriminate was the sole, or even dominant or primary, factor motivating the challenged act. *See, e.g., Allen v. Milligan*, 599 U.S. 1, 37 (2023) ("Demonstrating discriminatory intent, we have long held, 'does not require a plaintiff to prove that the challenged action rested *solely* on racially discriminatory purpose.'" (quoting *Arlington Heights*, 429 U.S. at 265)).

Courts analyze several evidentiary sources to determine intent, including "statistics demonstrating a 'clear pattern unexplainable on grounds other than' discriminatory ones," the historical background of the challenged law, the specific sequence of events leading up to the challenged law, departures from normal procedures or substantive conclusions, and relevant legislative history. *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158–59 (9th Cir. 2013) (quoting *Arlington Heights*, 429 U.S. at 266–68). Courts may also consider the "foreseeability of discriminatory impact" and the "availability of less discriminatory alternatives[.]" *Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983) (citing *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 465 (1979), and *United States v. Bd. of Sch. Comm'rs of City of Indianapolis*, 573 F.2d 400, 413 (7th Cir. 1978)).

A 2018 decision from the Northern District of Florida illustrates the proper approach. *See League of Women Voters of Fla.*, 314 F. Supp. 3d at 1205. There, the Florida Secretary of State issued an opinion that precluded counties from establishing early voting locations on public university campuses, despite allowing them in many other analogous government buildings. *Id.* at 1210. Students and organizations sued, and the court held that they were likely to show that the ban violated the Twenty-Sixth Amendment because "it is intentionally discriminatory on account of age." *Id.* at 1221. The court based this conclusion on the starkly

33

disparate impact of the ban on "younger voters than all other voters" and the lack of any credible non-discriminatory reason for prohibiting voting sites on college campuses and not elsewhere. *Id.* at 1221–23. The court therefore held the ban unconstitutional. *Id.*

### A. The district court improperly discounted substantial evidence of discriminatory purpose.

After rejecting a purposeful discrimination analysis entirely, the district court alternatively held that there was no material dispute of fact over whether the challenged laws were purposefully age discriminatory. ER-19. But in reaching this alternative holding, the district court improperly discounted or dismissed virtually all of Plaintiffs' record evidence, instead crediting the legislature's purported "legitimate reasons" for enacting the challenged laws. ER-20–21. By doing so, the district court violated the basic rule that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment" because their role "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick*, 850 F.3d at 441 (quoting *Tolan*, 572 U.S. at 656) (cleaned up). As the record evidence demonstrates, the legislature's intent in enacting the challenged laws is, at minimum, "genuinely disputed" "such that a reasonable juror drawing all inferences in favor of [Plaintiffs] could return a verdict in [Plaintiffs'] favor[.]" *Id.* (citations omitted).

34

Thus, Plaintiffs' Twenty-Sixth Amendment claim is "inappropriate for resolution on summary judgment" as a matter of law. *Id.* (citations omitted).

*First*, the legislative history shows that the legislature that enacted the challenged laws was specifically interested in age-based voting patterns and specifically sought to avoid changing methods of voting that were heavily used by older voters. In particular, the legislature considered whether—in addition to eliminating student identification for registration and voting—it should also eliminate the existing option for already-registered voters to prove their identity using an affidavit instead of an identification card. As part of that consideration, the Secretary and his Policy Director requested and received a breakdown by age and political party of the voters who had actually used an affidavit to prove their identity in recent elections. ER-79–80, -85:14–24. The Secretary testified that this request for information was likely prompted by legislators, ER-72:18–73:1, and the Secretary's Policy Director testified that legislators asked for breakdowns of the means by which voters of different ages voted "a lot[.]" ER-83:2–25, -85:14–24.

The results that the Secretary received in response to this request showed that affidavits were used predominantly by older voters, not younger ones:

35



ER-79.

After the Secretary received this information showing that older voters more often used personal identification affidavits, the Secretary changed his position and lobbied legislators to keep the affidavit option, which the legislature ultimately chose to do. *See* ER-80, -84:19–24, -87; H.B. 137, 67th Leg., 1st Reg. Sess., (Idaho 2023). And floor statements by legislators during the debate over the affidavit option confirm that legislators were particularly concerned with protecting older voters' rights to vote. One legislator argued that the affidavit should be preserved because "individuals. . . that lean towards the more elderly side" have "less" of a need for identification like a driver's license or passport and may no longer have those forms of identification, and "[t]he affidavit provides a way for th[em] . . . to

36

participate in the election."[2] Another explained that it was "wrong" to "take away the very right to vote" for "elderly grandparents that at times do not have any additional photo ID."[3] ER-119–20 ¶ 30. And a third explained that in his own experience as a farmer, he does not carry around a passport and that even when his driver's license is expired, he still "ha[s] a right to vote."[4] This evidence leads, at a minimum, to a genuine issue of material fact over whether lawmakers were motivated by age in supporting the elimination of student identification while opposing other changes that would have harmed older voters, instead of young ones. *See League of Women Voters of Fla.*, 314 F. Supp. 3d at 1223 (finding that the state's contraction of voting rights for young voters, in stark contrast to its expansion of voting rights for other voters, revealed "invidious purposes").

*Second*, there is also record evidence supporting the inference that the elimination of student identification, specifically, was driven by a desire to make it harder for students to vote. The Secretary originally prepared two draft bills amending the voter registration scheme: one version that retained student identification, and one that eliminated it. ER-61:16–25, -62:15–63:8, -92–95. The

---

[2] *See H. Chambers Deb. on H.B. 137* at 16:18–17:08, 67th Leg., 1st Reg. Sess. (Idaho Mar. 21, 2023), https://insession.idaho.gov/IIS/2023/House/Chambers/HouseChambers03-21-2023.mp4 ("House Debate").

[3] House Debate at 27:40–28:06.

[4] House Debate at 26:28-27:13.

Secretary first circulated to legislators the version permitting student identification. ER-65:14–18, -66:5–8. In response, Representative Brandon Mitchell—whose district includes a large student population from the University of Idaho—asked the Secretary to eliminate student identification because "Student ID is a big issue in college towns." ER-66:5–19. The Secretary admitted that this exchange motivated the switch to the version that eliminated student identification, which became House Bill 340. ER-69:8–20, -71:23–25. While the Secretary claimed not to recall "the specifics" of Representative Mitchell's "concerns about student IDs," ER-66:20–67:1, a reasonable factfinder could infer that the "big issue" Representative Mitchell was concerned about was the large number of students in his district that were voting with their student identification cards. Particularly in the absence of any record evidence of voter fraud or other problems associated with the use of student identification, there is at minimum a genuine issue of material fact regarding whether House Bill 340 was motivated by a desire to make voting more difficult for this demographic.

*Third*, the legislative process was marred by substantial procedural irregularities that were directly connected to the elimination of student identification. Representative Brent Crane, who chaired the House State Affairs Committee, repeatedly stalled the progress of House Bill 340 and refused to allow it to move forward until House Bill 124, which eliminated student identification,

38

was enacted. As Secretary McGrane testified, Representative Crane "didn't want the student identification bill to be killed in the Senate while the registration bill proceeded." ER-69:24–70:21. Ultimately, Representative Crane did not allow House Bill 340 to progress in committee until the legislature passed and the Governor signed House Bill 124. ER-69:24–70:3, -70:9–25. When House Bill 340 was finally considered, Representative Crane called a recess in the middle of the committee hearing to express his "adamant" objection to the bill off the record; the Secretary testified that it was "not common to even have a recess during one of those types of hearings." ER-74:2–11. The district court erred in dismissing this unusual procedure as "the usual 'sausage-making' in the legislative process." ER-21. The evidence supports the opposite conclusion: that the legislature was particularly motivated to eliminate the use of student identification, and to ensure it would accomplish that goal, it held other bills favored by the Secretary hostage. At minimum, the legislature's explicit and repeated emphasis on eliminating student identification from voting raises a genuine question of material fact regarding the legislature's intent to discriminate against young voters.

*Fourth*, the record makes clear that by intentionally targeting students, the challenged law intentionally targeted young voters in particular. Students are overwhelmingly young; the average age of undergraduate students at large public universities in Idaho is between 21 and 23 years old, compared to the median

registered voter's age of 52. ER-55. Indeed, the Secretary's own analysis shows that 57% of voters recorded as using student identification in the 2022 general election (and 63% of voters in the 2023 general election) were between 18 and 24 years old, compared to a baseline of only 5.69% of all Idaho voters falling into that age group in the 2022 general election. ER-58, -107–08. In other words, young voters (age 18-24 years old) were *35 times* more likely to use student identification than older voters (age 25 and older). ER-56. Much as with the elimination of on-campus early voting locations in *League of Women Voters*, the "target population" for the elimination of student identification "is unambiguous and its effects are lopsided." *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1222.

The district court erred in dismissing this evidence because it thought that the "elimination of student identification cards will not likely result in an inequality of opportunity to vote for younger citizens." ER-20. As explained in Section II, that is not the test, and the magnitude of the effect was, in any event, a disputed fact that the court was not free to resolve against Plaintiffs at summary judgment.

*Fifth*, the district court ignored the broader context in which the challenged laws were enacted: the Idaho legislature's repeated actions to suppress rising youth political engagement over the course of several years. ER-19–21. In 2021, the legislature passed legislation prohibiting teachers from offering extra credit as an

40

incentive for encouraging students to vote. Idaho Code § 74-604(3) (2021). In 2022 and 2023, Idaho students organized protests at the Idaho capitol to protest restrictive voting legislation, advocate for action on climate change, and protect transgender rights. ER-46. In response to this heightened level of student engagement in the political process, two House Committees prohibited or restricted receiving testimony at their hearings from people younger than 18, with one chair explaining that hearing student testimony was not a good use of legislators' time. ER-49.

The antagonism towards young citizens does not end there. The Idaho Administration and Elections website singles out college students with intimidating warnings of potential criminal penalties and additional questioning about their residence, which has the effect of discouraging them from registering to vote. *See* ER-49–51. And the Secretary's published directives warned students: "Registering to vote is a serious matter, which needs to be considered carefully because if abused it can subject individuals to criminal penalties." ER-49–50, -77.

The district court did not engage with any of this evidence, which raises a question of material fact of whether the legislature, consistent with a recent history of targeting young Idahoans, intentionally discriminated against young voters by enacting the challenged laws.

41

**B.    The district court ignored the time-honored relationship between discrimination against students and discrimination against young people.**

To be sure, some—though by no means all—of the evidence outlined above suggests hostility to students specifically, rather than to young voters in general. But long lines of precedent establish that illegal discrimination against young voters often takes the form of discrimination against student voters. Indeed, nearly all of the early Twenty-Sixth Amendment precedent focused on exactly that.

Most recently, in *League of Women Voters of Florida*, the court found that a prohibition on on-campus early voting sites violated the Twenty-Sixth Amendment. 314 F. Supp. 3d at 1222. Even though the prohibition did not explicitly single out young voters, the court had no problem connecting the dots and identifying a "stark pattern of discrimination[,] unexplainable on grounds other than age because [the prohibition] bears so heavily on younger voters than all other voters." *Id.* Because the "target population is unambiguous and its effects are lopsided," banning on-campus early voting—a method that is "especially popular among college students"—was intentionally discriminatory. *Id.* at 1209, 1222.

Similarly, in *Worden*, the New Jersey Supreme Court found that the Twenty-Sixth Amendment—as evidenced by its legislative history—protected resident students' right to vote in their college community. *Worden v. Mercer Cnty. Bd. of Elections*, 294 A.2d 233, 237 (N.J. 1972); *see id.* ("It is significant that the twenty-

42

sixth amendment prohibited not only denial but also abridgment of the voting rights granted to the younger voters, many of whom as the congressional and legislative members well know, would be resident in their college communities at election time.").

And the First Circuit in *Walgren v. Howes* confronted a challenge of a special town election that was set during a semester break in which most students would not be present and therefore would be discouraged from voting. After noting that "[t]he passage of a constitutional amendment does not take place lightly," the First Circuit considered the legislative history of the Twenty-Sixth Amendment and concluded that "[t]he specific problem faced by college communities with concentrated youth populations was faced in the consideration of the Twenty-Sixth Amendment. To the expressed fears of campus takeovers of small communities – since 'the student body [is] composed largely of 18 to 21-year-olds'–the candid response in debate was that if students 'satisfy the residency requirement of that town obviously they would be entitled to vote.'" *Walgren*, 482 F.2d at 102 (citing 117 Cong. Rec. at 7538–39, 7547).

Finally, in *Symm*, where the Supreme Court affirmed the district court's finding of a Twenty-Sixth Amendment violation, the district court considered the student activism motivating the Twenty-Sixth Amendment and several other student voting cases before concluding that restrictions on student voting in a

43

Texas college town violated the Twenty-Sixth Amendment. *United States v. Texas*, 445 F. Supp. 1245, 1261 (S.D. Tex. 1978), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105 (1979).

There is therefore nothing surprising, counterintuitive, or implausible about Plaintiffs' claim that laws facially targeting students, by eliminating student identification as a form of voter identification, were in fact motivated by age discrimination. Precedent shows that age discrimination in voting frequently targets students, just as it did here.

### C. The district court erred in discounting Plaintiffs' evidence in favor of the legislature's official statement of purpose.

The district court failed to credit all of this evidence and to draw reasonable inferences from it in Plaintiffs' favor, as the law requires. *See Zetwick*, 850 F.3d at 441. Instead, the district court treated the legislature's official statement of purpose as effectively dispositive, claiming the legislature had "offered legitimate reasons for excluding student identification cards due to the 'lack of uniformity in the sophistication of student ID cards.'" ER-20 (quoting H.B. 124, 67th Leg., Reg. Sess. (Idaho 2023), Statement of Purpose). But at the outset, the legislature's statement of the purpose of the law is expressly *not* a statement of legislative intent: the statement of purpose carries a disclaimer that "[i]t is neither intended as an expression of legislative intent nor intended for any use outside of the

44

legislative process, including judicial review[.]" H.B. 124, 67th Leg., Reg. Sess. (Idaho 2023), Statement of Purpose.

Regardless, given the evidence of discrimination that Plaintiffs offered, the legislature's articulated reasons for enacting laws could at most create a dispute of material fact. The legislature's "ostensibly neutral" justification for the bills does not immunize them from an intentional discrimination claim. *Shaw v. Reno*, 509 U.S. 630, 643–44 (1993). And it certainly does not defeat such a claim at the summary judgment stage. *Cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 805 (1973) (after defendant "articulate[s] some legitimate, nondiscriminatory reason" for the challenged conduct, "respondent must be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for his rejection were in fact a coverup for a racially discriminatory decision"). Rather, the court must still conduct a "sensitive inquiry" into all "circumstantial and direct evidence of intent as may be available," *Vill. of Arlington Heights*, 429 U.S. at 265–66. The court's role at summary judgment "is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Zetwick*, 850 F.3d at 441 (quoting *Tolan*, 572 U.S. at 656). If a defendant could defeat intentional discrimination claims "merely by denying that he had a discriminatory motive," then any constitutional protection "would be but a vain and illusory requirement." *Batson v.*

45

*Kentucky*, 476 U.S. 79, 98 (1986) (quoting *Norris v. Alabama*, 294 U.S. 587, 598 (1935)).

Here, the evidence suggests that—and at a minimum establishes a dispute of fact over whether—the purported interest in "uniformity" was pretextual. The Secretary testified that he could not recall *any* specific concerns that any legislator raised with him regarding student identification. ER-66:20–67:1, -70:12–21. And while one of House Bill 124's sponsors stated that the bill was motivated by a desire to prevent voter fraud, ER-122 ¶ 39, the Secretary testified that he was not aware of any instances of voter fraud involving the use of student identification, in Idaho or anywhere else, ER-64:6–13. There is no record evidence of any such issues with student identification. Just as Florida's justifications for prohibiting on-campus early voting sites to avoid parking issues and to minimize on-campus disruption "reek of pretext," *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1222, so too do the Secretary's justifications here.

Moreover, the alleged uniformity motivation is undermined by evidence of less discriminatory alternatives that would have been available to lawmakers if they were truly motivated by that issue. *See Jean*, 711 F.2d at 1486 (citing *Bd. of Sch. Comm'rs of City of Indianapolis*, 573 F.2d at 413). Eliminating all student identification was not the only option: the legislature could have allowed the use of student identification from universities which met its standards—whatever those

46

standards were. The failure of the legislature to even consider alternative, less discriminatory options is itself evidence of discriminatory intent. *See Bd. of Sch. Comm'rs of Indianapolis*, 573 F.2d at 413 ("Thus if plaintiffs establish either that . . . the government ignored less segregative options which would have furthered its policies as effectively as the more segregative option it chose, . . . then a prima facie case of discriminatory intent or purpose has been made out.").

In sum, the district court erred in relying on the legislature's own statements at the summary judgment stage, while minimizing and declining to draw favorable inferences from Plaintiffs' contrary evidence. Plaintiffs presented extensive evidence from virtually every relevant *Arlington Heights* factor as to the legislature's intent to discriminate against young people in enacting the challenged laws. There is, at the very least, a genuine issue of material fact regarding the legislature's intent in eliminating student identification for voting.

## CONCLUSION

The Court should reverse the district court's grant of summary judgment.

Date: February 7, 2025

Respectfully Submitted,

DAVID R. FOX
Elias Law Group LLP

/s/ *David R. Fox*
DAVID R. FOX
DANIEL J. COHEN
QIZHOU GE
TINA MENG MORRISON
Elias Law Group LLP
250 Massachusetts Avenue NW,
Suite 400
Washington, D.C. 20001
dfox@elias.law
dcohen@elias.law
age@elias.law
tmengmorrison@elias.law
(202) 968-4490

TERRI R. PICKENS
Pickens Law, P.A.
398 S. 9th Street, Suite 240
Boise, ID 83702
terri@pickenslawboise.com
(208) 954-5090

*Counsel for the Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, I hereby certify that according to the word count feature of the word processing program used to prepare this brief, this brief contains 10,911 words, including 40 words manually counted in any visual images, and excluding the parts of the document exempted by Rule 32(f). The brief's type size and typeface comply with Rules 32(a)(5) and (6), and this brief complies with the word limit of Circuit Rule 32-1.

Date: February 7, 2025                 /s/ *David R. Fox*
                                       DAVID R. FOX