No. 24-6376

# In the United States Court of Appeals for the Ninth Circuit

MARCH FOR OUR LIVES IDAHO and
IDAHO ALLIANCE FOR RETIRED AMERICANS,

*Plaintiffs-Appellants,*

*v.*

PHIL MCGRANE,
in his official capacity as Idaho Secretary of State,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Idaho
Case No. 1:23-cv-00107-AKB

**BRIEF OF BABE VOTE AND
LEAGUE OF WOMEN VOTERS OF IDAHO
AS AMICI CURIAE IN SUPPORT OF
PLAINTIFFS-APPELLANTS AND REVERSAL**

> Matthew P. Gordon
> Jonathan P. Hawley
> PERKINS COIE LLP
> 1201 Third Avenue, Suite 4900
> Seattle, Washington 98101
> (206) 359-8000
> MGordon@perkinscoie.com
> JHawley@perkinscoie.com
>
> *Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

AMICUS CURIAE'S IDENTITY AND INTEREST .......................................... 1

INTRODUCTION ............................................................................... 4

ARGUMENT ..................................................................................... 11

I.    HB 124 and HB 340 infringed on Idahoans' voting rights during the 2024 election. ........................................... 11

II.   The Idaho Supreme Court has effectively abandoned the right to vote, thus requiring federal intervention. ..................... 15

CONCLUSION ................................................................................. 20

CERTIFICATE OF SERVICE ............................................................. 21

# TABLE OF AUTHORITIES

## CASES

*BABE VOTE v. McGrane,*
546 P.3d 694 (Idaho 2024) ............................................................passim

*Buck v. Bell,*
274 U.S. 200 (1927) ...................................................................19

*Burdick v. Takushi,*
504 U.S. 428 (1992) .............................................................. 10, 17

*Crawford v. Marion County Election Board,*
553 U.S. 181 (2008) ............................................................17–18

*Massachusetts v. U.S. Department of Health & Human Services,*
682 F.3d 1 (1st Cir. 2012) ..........................................................19

*Mecinas v. Hobbs,*
30 F.4th 890 (9th Cir. 2022) .................................................. 10, 17

*Montana Democratic Party v. Jacobsen,*
545 P.3d 1074 (Mont. 2024), *cert. denied,* No. 24-220, 2025
WL 247449 (U.S. Jan. 21, 2025) ...............................................16

*Montana Democratic Party v. Jacobsen,*
No. DV 21-0451, 2022 WL 16735253 (Mont. Dist. Ct. Sept.
30, 2022), *aff'd,* 545 P.3d 1074 (Mont. 2024) ............................7

*Tedards v. Ducey,*
951 F.3d 1041 (9th Cir. 2020).....................................................18

*Van Valkenburgh v. Citizens for Term Limits,*
15 P.3d 1129 (Idaho 2000)..........................................................17

*Veasey v. Abbott,*
830 F.3d 216 (5th Cir. 2016) (en banc) .......................................7

*Yick Wo v. Hopkins,*
118 U.S. 356 (1886)....................................................................10

**CONSTITUTIONS**

Idaho Const. art. VI, § 4 ..............................................................18

**STATUTES**

Idaho Code § 49-2444 ................................................................... 6

**RULES**

Federal Rule of Appellate Procedure 29 ....................................... 3

**OTHER AUTHORITIES**

*2025 Legislative Preview Livestream Q&A with Lawmakers
    Recorded Dec. 17*, Idaho Statesman, https://tinyurl.com/
    3tjnefm4 (Dec. 18, 2024) .............................................................. 9

Andy Tallman, *Who's Afraid of the Student Vote?*, Mont.
    Kaimin (Oct. 19, 2023), https://tinyurl.com/rrdbhd7d .........................16

*Explore the Data*, Heritage Found., https://tinyurl.com/
    pesydy49 (last visited Feb. 14, 2025) ....................................... 6

*House Bill 139*, Idaho Legislature, https://tinyurl.com/
    36rjw4t8 (last visited Feb. 14, 2025)......................................... 9

Ian Max Stevenson, *'This Is Voter Disenfranchisement': Dozens
    of Ada County Residents Affected by Voter ID Law*, Idaho
    Statesman, https://tinyurl.com/3vkfewst (Nov. 5, 2024)................12–15

Isabella Sosa-Salazar, *Hundreds of BYU–Idaho Students Angry
    and Disappointed After Being Turned Away at the Polls*,
    East Idaho News, https://tinyurl.com/yuu28k59 (Nov. 6,
    2024)...............................................................................12–13

Jeffrey S. Sutton, *51 Imperfect Solutions: States and the
    Making of American Constitutional Law* (2018)....................................15

Johanna Alonso, *New Laws in 27 States Could Keep Students
    from Voting*, Inside Higher Ed (Sept. 27, 2024), https://
    tinyurl.com/mw2wwk6p .......................................................... 6

Joshua A. Douglas, *The Right to Vote Under State Constitutions*, 67 Vand. L. Rev. 89 (2014) ................................... 10, 15, 19

Katie Hilton & Sam Searles, *One Week Away from Election Day, Most States Are Behind 2020 in Youth Voter Registration*, Ctr. for Info. & Rsch. on Civic Learning & Engagement (Oct. 30, 2024), https://tinyurl.com/45hx69a9 ...............12

Scott McIntosh, *Should College Students Vote in Idaho? One Legislator Thinks It's Not a Good Idea*, Idaho Statesman (Dec. 20, 2024), https://tinyurl.com/2kxfcb64 ...................................... 5

*Senate Bill 1049*, Idaho Legislature, https://tinyurl.com/4wsubatw (last visited Feb. 14, 2025) ....................................... 9

*State-by-State 2020 Youth Voter Turnout: West and Southwest*, Ctr. for Info. & Rsch. on Civic Learning & Engagement (Mar. 24, 2021), https://tinyurl.com/mf2ydkda................ 4

*Youth Voter Registration Is Up Compared to 2018—Especially in Key Battlegrounds*, Ctr. for Info. & Rsch. on Civic Learning & Engagement (Nov. 1, 2022), https://tinyurl.com/5npy337t ................................................... 4

## AMICUS CURIAE'S IDENTITY AND INTEREST

BABE VOTE is a nonpartisan, nonprofit organization dedicated to encouraging Idahoans—young Idahoans in particular—to register and vote. Its volunteers conduct voter-registration drives at local schools and community events, organize door-knocking campaigns to remind people to vote in the runup to elections, and educate students, young adults, and community members about voting rights.

The League of Women Voters of Idaho (the "League," and together with BABE VOTE, "Amici") is a nonpartisan, nonprofit organization that has encouraged informed and active participation in the political process for more than seventy-five years. The League educates members of its community about voting rights and the electoral process and conducts voter-registration activities and nonpartisan voter-information campaigns.

In undertaking their missions to expand access to the franchise, Amici and their volunteers have witnessed firsthand the burdens imposed on Idaho voters by the laws challenged in this litigation: House Bill 124 ("HB 124"), which eliminated Idaho's longstanding practice of allowing use of student ID cards at the polls, and House Bill 340 ("HB 340"), which in turn eliminated use of student IDs during the voter-registration process and further limited the types of identification Idahoans can use to register. These bills have made

1

it harder for young Idahoans to register and vote—and thus impeded Amici's missions to increase turnout and ensure that the state's elections remain free, fair, and accessible regardless of a voter's age.

HB 340 has further hindered Amici's voter-registration efforts by requiring that new voters provide documentary proof of residence, a significant burden for Idahoans who have recently moved—including particularly mobile populations like students—or who lack ready access to the necessary documentation.

The new proof-of-residency requirement has had a particularly inimical impact on the League's efforts by making it harder to register Idahoans who are in assisted-living facilities, houseless, or living with disabilities. The League's previous success registering voters at retirement centers and nursing-care facilities has been significantly reduced by HB 340, as it can now work only with facilities willing to designate staff members to copy documents and IDs and print materials establishing residency. In the leadup to the 2024 general election, the League's limited resources prevented it from assisting homebound voters and voters with disabilities, who must now surmount significant obstacles to register under HB 340— and, in some instances, are wholly disenfranchised.

Amici filed suit in state court to protect the voting rights of eligible Idahoans, challenging HB 124 and HB 340 under the Idaho Constitution. Following circumscribed proceedings before the trial court—during which, among other substantive and procedural shortcomings, the court ignored controlling precedent about the standard of review, disregarded procedural rules, and divined legislative intent from a statutory statement that expressly directed that it was *not* to be used for purposes of judicial review—Amici appealed to the Idaho Supreme Court, which made the dramatic and unprecedented decision to apply *rational-basis review* to laws burdening Idaho voters' ability to register and cast ballots. *See BABE VOTE v. McGrane*, 546 P.3d 694, 707–11 (Idaho 2024).

Given their voter-advocacy efforts, Amici have a clear interest in the outcome of this appeal, which will determine whether HB 124 and HB 340 continue to impose burdens on young Idahoans and other marginalized voters. More generally, given the Idaho Supreme Court's decision to effectively rubberstamp legislation burdening the right to vote, Amici also have a strong interest in ensuring that this and other federal courts apply robust protection to the franchise under the U.S. Constitution.

Pursuant to Federal Rule of Appellate Procedure 29(a)(2) and (a)(4)(E), Amici state that all parties have consented to the filing of this brief;

that no party's counsel authored the brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and that no person other than Amici, their members, and their counsel contributed money that was intended to fund preparing or submitting the brief.

## INTRODUCTION

Young voters in Idaho started showing up.

Though young Idahoans long lagged in voter participation, turnout over the past decade dramatically increased, due in part to the efforts of Amici and other voting-rights advocates. In the 2016 general election, only 38% of Idahoans aged eighteen to twenty-nine cast ballots; by the 2020 election, that number had jumped to nearly 50%.[1] Young voter registration climbed as well: Between 2018 and 2022, registration increased 16% among Idahoans aged eighteen to twenty-four and *81%* among Idahoans aged eighteen and nineteen—by far the largest increase in any state.[2]

---

[1] *State-by-State 2020 Youth Voter Turnout: West and Southwest*, Ctr. for Info. & Rsch. on Civic Learning & Engagement (Mar. 24, 2021), https://tinyurl.com/mf2ydkda.

[2] *Youth Voter Registration Is Up Compared to 2018—Especially in Key Battlegrounds*, Ctr. for Info. & Rsch. on Civic Learning & Engagement (Nov. 1, 2022), https://tinyurl.com/5npy337t.

Following this dramatic and historic surge in young voter participation, the Idaho Legislature responded by making it more difficult for students and other young Idahoans to register and vote. Its motivation was not hard to discern: The Idaho Legislature did not want college students to vote. In the aftermath of last year's general election, State Representative Brent Crane—currently the chair of the Idaho House State Affairs Committee, which oversees election and voting-rights legislation—expressed his antipathy to student voting while speaking with the *Idaho Statesman*:

> "I want people that have a vested interest, that are living here," Crane said, as if college students aren't "living here." "People that have put down roots here, people that are paying property taxes, people that are paying income taxes, people that have a vested interest in the state of Idaho, not kids that are blipping in, blipping out. 'Oh, hey, they got a new football coach, so I'm transferring, I'm going somewhere else.' Those kids casting votes, I don't think it's who you want deciding elections."[3]

The Idaho Legislature manifested its hostility to student voting by passing two bills that targeted young voters by erecting unnecessary barriers to the franchise: HB 124 and HB 340. Since 2010, Idaho students had been

---

[3] Scott McIntosh, *Should College Students Vote in Idaho? One Legislator Thinks It's Not a Good Idea*, Idaho Statesman (Dec. 20, 2024), https://tinyurl.com/2kxfcb64. The *Statesman*'s editorial writer wryly commented that Representative Crane's generalizations were more than a little misguided: A University of Idaho graduate student interviewed for the column was initially unavailable for comment because "[h]e was working, earning a wage and contributing to the income tax base." *Id.*

able to use their student IDs for registration and voting—and during that time, as the Idaho Secretary of State conceded during legislative testimony, there were no problems with student IDs, least of all any fraud associated with their use.[4] But spurred by a nationwide partisan effort to reduce student participation in elections,[5] the Idaho Legislature nevertheless eliminated use of student IDs during the voting process. To make matters worse, it also made it harder for other Idahoans—including some of the state's most vulnerable citizens—to register *and* for voting-rights organizations like Amici to assist with the registration process. And though the laws ostensibly help Idahoans navigate these new requirements by providing "free" voter ID, *see* Idaho Code § 49-2444(22), those ID cards require underlying documentation that is *not* necessarily free and are provided only after applicants surrender *all* other ID cards and driver's licenses, whether issued by Idaho or any other jurisdiction, *see id.* § 49-2444(2), (6).

---

[4] The Idaho Secretary of State's testimony is confirmed by a voter-fraud database maintained by the conservative Heritage Foundation, which reports only thirteen cases of "fraud" in Idaho between 1982 and 2024—none of which involved student IDs. *See Explore the Data*, Heritage Found., https://tinyurl.com/pesydy49 (last visited Feb. 14, 2025).

[5] *See, e.g.*, Johanna Alonso, *New Laws in 27 States Could Keep Students from Voting*, Inside Higher Ed (Sept. 27, 2024), https://tinyurl.com/mw2wwk6p ("States across the nation—primarily with Republican legislatures—have passed restrictive voting laws since the 2020 election, many in response to lies about widespread election fraud stoked by former president Donald Trump.").

HB 124 and HB 340 demonstrate that laws don't need to explicitly deny the franchise to have the direct effect of preventing someone from casting a ballot. By imposing new ID requirements, these laws increase the cost of voting—a not-insignificant impediment, especially for young and marginalized voters. "The costs of voting include informational and administrative costs such as unexpected changes to voting processes, burdens associated with overcoming bureaucratic requirements, compliance costs, opportunity costs, time costs, travel costs, administrative hurdles, and actual monetary costs. . . . [A]s the costs of voting increase, the likelihood that an individual votes decreases." *Mont. Democratic Party v. Jacobsen*, No. DV 21-0451, 2022 WL 16735253, at *19 (Mont. Dist. Ct. Sept. 30, 2022), *aff'd*, 545 P.3d 1074 (Mont. 2024); *see also, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 263 (5th Cir. 2016) (en banc) ("According to a well-established formula employed by political scientists to assess individuals' likelihood of voting in an election, increasing the cost of voting decreases voter turnout—particularly among low-income individuals, as they are most cost sensitive.").

These concerns are neither hypothetical nor fleeting—HB 124 and HB 340 have a pronounced effect on the ability to vote and actually prevented hundreds of Idahoans from casting ballots last year. Courts should

not wave away voter-ID restrictions and similar rules as mere inconveniences; by raising the costs of voting, these laws foreclose the franchise no less than express prohibitions.

HB 124 and HB 340, in both design and effect, target disfavored groups by imposing unnecessary barriers to voting—a gambit that is impermissible by any measure under the U.S. Constitution. And Amici's concerns are not merely speculative: The 2024 general election demonstrated the insidious effects of the bills and their deleterious effect on voter registration and turnout in Idaho. *Hundreds* of students were turned away from the polls, and some otherwise-eligible voters lost the opportunity to vote because they were unable to acquire the necessary documentation to register.[6]

---

[6] Though student voting is the focus of Plaintiffs' claims and this amicus brief, other Idahoans have also been significantly disadvantaged by HB 340's changes to the voter-registration process. In 2019, the League registered around 1,000 Idahoans at more than 70 assisted-living facilities in the Treasure Valley. During the summer and fall of 2024, by contrast, the League was able to work only with facilities willing to designate staff members to copy and print IDs and other newly required documentation—three facilities in total. The League managed to register sixty-six voters but were unable to assist another eighteen who lacked the required ID, many of whom had moved from out of state and none of whom had the resources and ability to obtain Idaho ID before election day. Homebound voters and Idahoans with disabilities experienced similar issues, and eight unhoused individuals who approached League members at community events could not be registered because they lacked the necessary ID and documentation.

Despite these substantial burdens on Idahoans' voting rights, legislative remediation is unlikely. During a livestreamed Q&A sponsored by the *Idaho Statesman*, Representative Crane was asked if any changes to these laws might be appropriate given the disenfranchisement witnessed during the 2024 general election. He responded in the negative because "the law did exactly what it was intended to do" when it made it more difficult for college students to vote—and indicated that, far from trying to reduce the scope of disenfranchisement, further legislative efforts to maintain "election integrity" were likely forthcoming.[7] Indeed, Representative Crane's committee is currently considering a bill to end no-excuse absentee voting in Idaho,[8] while legislation introduced in the Idaho Senate would eliminate the option for registered voters to submit affidavits rather than present photo ID at polling places.[9]

Nor do Idaho courts offer hope for redress. Amici's state-court litigation concluded with the Idaho Supreme Court's adoption of rational-

---

[7] *2025 Legislative Preview Livestream Q&A with Lawmakers Recorded Dec. 17*, Idaho Statesman, https://tinyurl.com/3tjnefm4 (Dec. 18, 2024) (discussion of HB 124 and HB 340 begins at 53:15).

[8] *See House Bill 139*, Idaho Legislature, https://tinyurl.com/36rjw4t8 (last visited Feb. 14, 2025).

[9] *See Senate Bill 1049*, Idaho Legislature, https://tinyurl.com/4wsubatw (last visited Feb. 14, 2025).

basis review for claims involving voting rights—a *less*-protective standard even than the federal *Anderson-Burdick* test, which itself has been criticized for prescribing "a lenient balancing test" that "underenforce[s]" voting rights "because it makes establishing a violation too difficult for plaintiffs."[10] This result underscores not only that federal intervention is needed to safeguard Idahoans' voting rights, but also that the *BABE VOTE* decision holds no persuasive value for this Court in this case; the Idaho Supreme Court upheld HB 124 and HB 340 under a lesser standard than any that might arguably apply to Plaintiffs' claims here.

Ultimately, though Idaho courts might have shut their doors to voting-rights claims, this Court can take up the mantle and safeguard the franchise—which must be "accorded 'the most fundamental significance under our constitutional structure'" because "[t]he right to vote is 'preservative of all rights.'" *Mecinas v. Hobbs*, 30 F.4th 890, 904 (9th Cir. 2022) (first quoting *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); and then quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)).

---

[10] Joshua A. Douglas, *The Right to Vote Under State Constitutions*, 67 Vand. L. Rev. 89, 98–101 (2014).

## ARGUMENT

HB 124 and HB 340 have accomplished what the Idaho Legislature apparently intended—placing obstacles between young voters and ballot boxes—while also making it more difficult to register other marginalized Idahoans. The 2024 general election made clear that Amici's concerns about voter suppression were not overstated; these laws made it harder to vote and prevented Idahoans from voting. And because the Idaho Supreme Court has all but sworn off providing meaningful protection to voting rights, it falls to *this* Court to do so instead.

## I. HB 124 and HB 340 infringed on Idahoans' voting rights during the 2024 election.

During their state-court litigation, Amici provided firsthand and expert evidence of the hurdles that Idahoans must clear to register and vote under HB 124 and HB 340—and of the suppressive effects that would likely follow. The 2024 general election then proved that these predictable consequences came to pass.

BABE VOTE experienced the barriers imposed by HB 124 and HB 340 well before election day. While undertaking voter-registration drives at college campuses, BABE VOTE found that between 20% and 35% of people

who tried to register were unable to do so because of the new laws.[11] As these obstacles increased, Idaho's nation-leading gains in youth voter registration plummeted; between the 2020 general election and September 2024, the number of registered voters in Idaho aged eighteen to twenty-nine *dropped* by more than 3%.[12] Among voters aged eighteen and nineteen, the decline was even starker: *more than 22%*.[13]

On election day, *hundreds* of students at Brigham Young University–Idaho were turned away from the polls, which Madison County officials attributed to HB 124 and HB 340.[14] One student, Aubrey Slade, recounted her experience:

> "My problem really was just that I looked it up and found a lot of sources saying students were able to use their student ID," Slade said. "But I guess Idaho passed a rule this year you have to have an Idaho license or federal license, which sucks."

---

[11] Ian Max Stevenson, *'This Is Voter Disenfranchisement': Dozens of Ada County Residents Affected by Voter ID Law*, Idaho Statesman, https://tinyurl.com/3vkfewst (Nov. 5, 2024).

[12] Katie Hilton & Sam Searles, *One Week Away from Election Day, Most States Are Behind 2020 in Youth Voter Registration*, Ctr. for Info. & Rsch. on Civic Learning & Engagement (Oct. 30, 2024), https://tinyurl.com/45hx69a9.

[13] *Id.*

[14] Isabella Sosa-Salazar, *Hundreds of BYU–Idaho Students Angry and Disappointed After Being Turned Away at the Polls*, East Idaho News, https://tinyurl.com/yuu28k59 (Nov. 6, 2024).

When Slade tried to vote, she brought a North Dakota driver's license, proof of residency and a student ID. The poll workers turned her away.

"I was pretty bummed. This was the first presidential election I'd be able to vote in, and I was very excited for it," Slade said.[15]

The disenfranchising effects were not limited to students. The day before the November 5 election, Ada County Clerk Trent Tripple—a Republican—told the *Idaho Statesman* that HB 340 had prevented upwards of 100 people from registering, including older voters who had moved recently:

"It feels like I am denying legitimate citizens who have proved residency the ability to vote because of this strict ID requirement," Tripple said. He said he's seen the problem affecting people who have recently moved into a senior home, or others who have recently moved to Idaho from another state.

"They really want to vote and they just don't have the ability to do that, even though they can prove their citizenship and their residence," he said. "That's the hurdle I've seen has been artificially built now."[16]

The *Statesman* also identified a further consequence of HB 340 that Amici had warned about:

Without a passport or another form of federal photo ID, an out-of-state license or expired Idaho license is not sufficient. And a resident who has moved into a senior-living facility must re-

---

[15] *Id.*

[16] *Stevenson*, *supra* note 11.

register because of the address change but may not have an active license.

"I don't think not having a current Idaho driver's license should be the impediment to them voting," Tripple said.

For some residents, the problem could be solved by getting an Idaho driver's license. For instance, a voter who has a copy of their birth certificate, an out-of-state driver's license and proof of residency (a rental agreement, pay stub or bank statement with their current address, etc.) has the documentation needed to get an in-state driver's license. But if they only realized the problem in the past few days, they likely were out of luck—the DMV in Ada County operates by appointment only, and, as of Monday night, was booked out for more than a week past Election Day.[17]

"What's really disheartening," Clerk Tripple explained, "is they stand in line for two hours, then they get to the front and they realize they don't have what they need to register to vote."[18] Even the Idaho Secretary of State was forced to acknowledge the difficulties caused by HB 340: "We are anticipating this could be a challenge for some voters (on Election Day), specifically who moved to the state recently."[19]

In sum, the deleterious effects of HB 124 and HB 340 are not theoretical; during the first general election since their enactment, hundreds of otherwise-eligible Idahoans were turned away from the ballot box and many others were prevented from registering at all. State Representative

---

[17] *Id.*

[18] *Id.*

[19] *Id.*

John Gannon summed up the situation: "This is definitely voter disenfranchisement," he said, adding, "By making technical rules and not providing the staff to address the issues they are preventing Idahoans from voting."[20]

## II.    The Idaho Supreme Court has effectively abandoned the right to vote, thus requiring federal intervention.

State courts and state constitutions have a vital role to play in safeguarding fundamental rights—including in particular the right to vote. Unique federalism considerations often cause federal courts to *under*enforce constitutional rights, thus providing impetus for state courts to interpret their analogous constitutional rights with greater degrees of care and protection.[21] Accordingly, "[a] renewed focus on the power of state constitutions provides the answer for how best to protect the fundamental right to vote."[22]

Recent litigation in Montana demonstrates this principle in action. Reflecting a nationwide trend, *see supra* note 5, the past four years have seen the Montana Legislature's enactment of various voter-suppressive measures,

---

[20] *Id.*

[21] *See* Jeffrey S. Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law* 175 (2018).

[22] Douglas, 67 Vand. L. Rev. at 91–92.

several of which directly targeted student voting—and have been challenged in court.[23] One such law, like HB 124, targeted the use of student IDs at the polls, "revis[ing] voter ID requirements such that those wishing to vote with a Montana student ID had to show additional supporting documentation." *Mont. Democratic Party v. Jacobsen*, 545 P.3d 1074, 1082 (Mont. 2024), *cert. denied*, No. 24-220, 2025 WL 247449 (U.S. Jan. 21, 2025). The Montana Supreme Court struck down the law as violative of the state's constitution, concluding that "the State has not shown that, after almost two decades of allowing student IDs as primary forms of ID," treating students IDs different from other forms of ID

> did not ensure electors were qualified voters, ease administrative burdens, nor improve voter confidence. . . . Excluding student IDs from the list of acceptable photo IDs imposes a burden on student voting and the Secretary has not established that it is necessary for any legitimate government purpose, much less that it is more important than the right to vote. Nor is it a reasonable restriction of voter's rights.

*Id.* at 1107.

Montana's safeguarding of voting rights is not, unfortunately, universal; compare the Montana Supreme Court's protection of the franchise—including "apply[ing] strict scrutiny" to "law[s that]

---

[23] *See, e.g.*, Andy Tallman, *Who's Afraid of the Student Vote?*, Mont. Kaimin (Oct. 19, 2023), https://tinyurl.com/rrdbhd7d.

impermissibly interfere[] with the right to vote," *id.* at 1090—with the experience of Amici before the *Idaho* Supreme Court.

Amici filed suit in Idaho against the backdrop of precedent robustly protecting the right to vote. The Idaho Supreme Court held more than two decades ago that, "[b]ecause the Idaho Constitution expressly guarantees the right of suffrage, . . . voting is a fundamental right under the Idaho Constitution"—and, because "the appropriate standard of review to be applied to a law infringing on that right is strict scrutiny," laws that infringe on the right to vote "will be upheld only where the State can demonstrate the law is necessary to promote a compelling state interest." *Van Valkenburgh v. Citizens for Term Limits*, 15 P.3d 1129, 1134 (Idaho 2000). Amici thus understood that the Idaho Supreme Court applied a more protective standard than federal courts when safeguarding the right to vote, since the "flexible standard" applied under the federal *Anderson-Burdick* test does *not* apply "strict scrutiny [] to all laws imposing a burden on the right to vote." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190 n.8 (2008) (plurality opinion) (quoting *Burdick*, 504 U.S. at 434); *see also, e.g.*, *Mecinas*, 30 F.4th at 904 (only laws that impose severe burden on voting rights must satisfy strict scrutiny under *Anderson-Burdick*). Given their firsthand and expert evidence of the burdens imposed by HB 124 and

HB 340, Amici were confident that the Idaho courts would apply this precedent, forcefully protect the right to vote, and invalidate these suppressive laws.

Instead, the Idaho Supreme Court reversed course. Although it made a feint towards *Anderson-Burdick*, citing the latter decision and this Court's voting-rights precedent, *see BABE VOTE*, 546 P.3d at 709–10, the Idaho Supreme Court ultimately decided that, because "voter identification procedures, including the acceptable forms of identification, clearly fall within the broad ambit of the legislature's constitutional power to enact 'qualifications' and 'conditions' on the right of suffrage[,] . . . . *rational basis review* should be applied," *id.* at 711 (emphasis added) (quoting Idaho Const. art. VI, § 4). The Idaho Supreme Court thus opted for *lesser* protection than the federal standard, since "the burdening of the right to vote always triggers a higher level of scrutiny than rational basis review" under *Anderson-Burdick. Tedards v. Ducey*, 951 F.3d 1041, 1066 (9th Cir. 2020); *see also, e.g.*, *Crawford*, 553 U.S. at 190–91 (applying *Anderson-Burdick* to voter-ID law).

The Idaho Supreme Court's decision to apply rational-basis review left Amici—and any other Idahoans who aim to safeguard their voting rights in state court—with little hope of success. Claims "tested by [the] rational basis

standard, famously called by Justice Holmes the 'last resort of constitutional argument,' rarely succeed." *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1, 9 (1st Cir. 2012) (citation omitted) (quoting *Buck v. Bell*, 274 U.S. 200, 208 (1927)). Indeed, Amici's state-court claims, despite being bolstered by evidence of discriminatory impact and burdens on the right to vote, inevitably and unceremoniously failed. *See BABE VOTE*, 546 P.3d at 715.

By applying rational-basis review to any legal challenge implicating voting qualifications or conditions—from voter ID to registration requirements to polling-place limitations—the Idaho Supreme Court has effectively made lost causes of a host of voting-rights claims and opened the floodgates to new restrictions targeting disfavored groups. Perversely, because the court's earlier *Van Valkenburgh* decision remains good law in some instances, the Idaho Supreme Court now applies strict scrutiny to *what* appears on a ballot but affords virtually no protection to *who* can cast that ballot.

If state courts and state laws can "restore the importance of the most foundational right in our democracy" by "giv[ing] broader protection to the individual right to vote" than the U.S. Constitution,[24] then surely the reverse

---

[24] Douglas, 67 Vand. L. Rev at 142–43.

is also true: When states choose to protect the right to vote with less zeal and consideration than *Anderson-Burdick*, it becomes the obligation of federal courts to step in and safeguard the franchise. Amici urge this Court to do precisely that.

## CONCLUSION

Amici respectfully request reversal of the District Court's order.

Respectfully submitted this 14th day of February, 2025.

PERKINS COIE LLP

By: *s/ Matthew P. Gordon*
Matthew P. Gordon
Jonathan P. Hawley
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
(206) 359-8000
MGordon@perkinscoie.com
JHawley@perkinscoie.com

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the attached document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 14, 2025.

*s/ Matthew P. Gordon*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-6376

I am the attorney or self-represented party.

**This brief contains** 4,225 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [      ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Matthew P. Gordon **Date** 02/14/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*