No. 24-6376

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARCH FOR OUR LIVES IDAHO, *et al.*,

*Plaintiff-Appellants*,

v.

PHIL MCGRANE, in official capacity as
Idaho Secretary of State,

*Defendants-Appellee.*

On Appeal from the United States District Court
for the District of Idaho
Case No. 1:23-cv-00107-AKB

## APPELLEE'S ANSWERING BRIEF

RAÚL R. LABRADOR
ATTORNEY GENERAL

OFFICE OF IDAHO ATTORNEY
GENERAL
700 W. Jefferson St.
Suite 210
Boise, ID 83720
(208) 334-2400
michael.zarian@ag.idaho.gov

ALAN M. HURST
Solicitor General

MICHAEL A. ZARIAN
Deputy Solicitor General

AARON M. GREEN
Deputy Attorney General

*Counsel for Appellee*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ............................................................................................... 1

STATEMENT OF THE CASE ............................................................................... 2

   I.  Idaho Regulates Elections to Make Them Secure and Accessible. .......................... 2

   II.  Idaho Amends Its Voter Identification Laws to Provide Uniformity and Enhance Reliability. ................................................................................. 6

   III. Several Organizations Challenge H.B. 340 and H.B. 124. ............................. 10

STATEMENT OF THE ISSUES ........................................................................... 13

STANDARD OF REVIEW ................................................................................. 13

SUMMARY OF THE ARGUMENT ..................................................................... 13

ARGUMENT .................................................................................................. 15

   I.  The Plaintiffs Lack Standing. ...................................................................... 15

      A.  MFOL lacks organizational standing. ................................................... 16

      B.  MFOL lacks associational standing. ..................................................... 20

   II.  H.B. 340 and H.B. 124 Do Not Deny or Abridge the Right to Vote. ................ 29

      A.  The right to vote is abridged only by a "material" impediment to voting. ................................................................................................ 31

      B.  Other courts have required a "material" impediment to voting in the Twenty-Sixth Amendment context. .......................................... 34

      C.  H.B. 340 and H.B. 124 do not impose a "material" impediment to voting. ................................................................................................ 36

      D.  The plaintiffs' counterarguments are meritless. .................................... 41

   III. H.B. 340 and H.B. 124 Were Not Enacted on Account of Age. ....................... 44

      A.  The Legislature had legitimate purposes to enact H.B. 340 and H.B. 124. ...... 46

      B.  The plaintiffs present no meaningful evidence of intent. ....................... 50

CONCLUSION ................................................................................................ 54

## TABLE OF AUTHORITIES

### CASES

*Abbott v. Perez,*
585 U.S. 579 (2018) ............................................................................. 54

*Alexander v. S.C. State Conf. of the NAACP,*
602 U.S. 1 (2024) ............................................................... 45, 50, 52

*Am. Diabetes Ass'n v. United States Dep't of the Army,*
938 F.3d 1147 (9th Cir. 2019) ............................................................ 18

*America Unites for Kids v. Rousseau,*
985 F.3d 1075 (9th Cir. 2021) ............................................................ 24

*Anderson v. Celebrezze,*
460 U.S. 780 (1983) ............................................................................. 34

*Arizona All. for Retired Ams. v. Mayes,*
117 F.4th 1165 (9th Cir. 2024) .......................................................... 17

*Ariz. Democratic Party v. Hobbs,*
18 F.4th 1179 (9th Cir. 2021) ............................................................ 52

*Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.,*
713 F.3d 1187 (9th Cir. 2013) ............................................................ 25

*BABE VOTE v. McGrane,*
546 P.3d 694 (Idaho 2024) ......................................................... 11, 19

*Brnovich v. Democratic Nat'l Comm.,*
594 U.S. 647 (2021) ...................................................................*passim*

*Bullock v. Carter,*
405 U.S. 134 (1972) ............................................................................. 33

*Burdick v. Takushi,*
504 U.S. 428 (1992) .......................................................... 1, 34, 44, 50

*City of Cleburne, Tex. v. Cleburne Living Ctr.,*
473 U.S. 432 (1985) ............................................................................. 43

*City of Mobile v. Bolden,*
446 U.S. 55 (1980) ............................................................................... 41

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ............................................................................. 24

*Colo. Project-Common Cause v. Anderson,*
495 P.2d 220 (Colo. 1972) .................................................................. 30

*Common Cause/N.Y. v. Brehm,*
  432 F. Supp. 3d 285 (S.D.N.Y. 2020) ..................................................52

*Crawford v. Marion Cnty. Election Bd.,*
  553 U.S. 181 (2008) ...........................................................................*passim*

*Do No Harm v. Pfizer Inc.,*
  96 F.4th 106 (2d Cir. 2024) ..............................................................28

*Draper v. Healey,*
  827 F.3d 1 (1st Cir. 2016) .................................................................28

*FDA v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024) ...........................................................................*passim*

*Fleck & Assocs., Inc. v. City of Phoenix,*
  471 F.3d 1100 (9th Cir. 2006) ....................................................21, 22

*Fowler Packing Co., Inc. v. Lanier,*
  844 F.3d 809 (9th Cir. 2016) ............................................................52

*Ga. Republican Party v. SEC,*
  888 F.3d 1198 (11th Cir. 2018) ........................................................28

*Gomillion v. Lightfoot,*
  364 U.S. 339 (1960) ..........................................................................32

*Gonzalez v. Arizona,*
  677 F.3d 383 (9th Cir. 2012) ..............................................12, 32, 42

*Goosby v. Osser,*
  409 U.S. 512 (1973) ..........................................................................37

*Guinn v. United States,*
  238 U.S. 347 (1915) ..........................................................................32

*Harman v. Forssenius,*
  380 U.S. 528 (1965) .....................................................................42, 42

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982) ..........................................................................17

*Hunt v. Wash. State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) .............................................................20, 22, 23

*Johnson v. Waller Cnty.,*
  593 F. Supp. 3d 540 (S.D. Tex. 2022) .............................................36

*Kimel v. Fla. Bd. of Regents,*
  528 U.S. 62 (2000) .......................................................................43,45

*Kowalski v. Tesmer,*
   543 U.S. 125 (2004) ........................................................................................21

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest,*
   624 F.3d 1083 (9th Cir. 2010) .........................................................................20

*Lane v. Wilson,*
   307 U.S. 268 (1939) ................................................................................. 32, 41

*League of Women Voters of Fla., Inc., v. Detzner,*
   314 F. Supp. 3d 1205 (N.D. Fla. 2018) ...........................................................36

*Lee v. Va. State Bd. of Elections,*
   843 F.3d 592 (4th Cir. 2016) .............................................. 31, 36, 43, 44

*Lee v. Va. State Bd. of Elections,*
   188 F. Supp. 3d 577 (E.D. Va. 2016) ..............................................................36

*Louisiana v. United States,*
   380 U.S. 145 (1965) ........................................................................................32

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ...........................................................................16, 19, 20

*McDonald v. Bd. of Election Comm'rs of Chicago,*
   394 U.S. 802 (1969) ........................................................................................33

*Mecinas v. Hobbs,*
   30 F.4th 890 (9th Cir. 2022) ...........................................................................43

*Mi Familia Vota v. Fontes,*
   129 F.4th 691 (9th Cir. 2025) .........................................................................27

*Miller v. Gammie,*
   335 F.3d 889 (9th Cir. 2003) ..................................................................... 24, 28

*Munro v. Socialist Workers Party,*
   479 U.S. 189 (1986) ........................................................................................48

*Nashville Student Org. Comm. v. Hargett,*
   155 F. Supp. 3d 749 (M.D. Tenn. 2015) ...............................................36, 39, 48

*Nation v. City of Glendale,*
   804 F.3d 1292 (9th Cir. 2015) .........................................................................13

*National Council of La Raza v. Cegavske,*
   800 F.3d 1032 (9th Cir. 2015) .........................................................................27

*N.J. Physicians, Inc. v. President of U.S.,*
   653 F.3d 234 (3d Cir. 2011) ............................................................................28

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  597 U.S. 1 (2022) ..................................................................................31

*N.C. State Conf. of the NAACP v. McCrory,*
  182 F. Supp. 3d 320 (M.D.N.C. 2016) ..............................................36

*Ohio Democratic Party v. Husted,*
  834 F.3d 620 (6th Cir. 2016) ..............................................................47

*Opatz v. City of St. Cloud,*
  196 N.W.2d 298 (Minn. 1972) ...........................................................30

*Oregon v. Mitchell,*
  400 U.S. 112 (1970) .............................................................................29

*Padilla-Ramirez v. Bible,*
  882 F.3d 826 (9th Cir. 2017) ..............................................................34

*Pers. Adm'r of Mass. v. Feeney,*
  442 U.S. 256 (1979) .............................................................................50

*Pub. Integrity All., Inc. v. City of Tucson,*
  836 F.3d 1019 (9th Cir. 2016) ............................................................50

*Religious Sisters of Mercy v. Becerra,*
  55 F.4th 583 (8th Cir. 2022) ...............................................................28

*Rosario v. Rockefeller,*
  410 U.S. 752 (1973) .............................................................................37

*S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC,*
  713 F.3d 175 (4th Cir. 2013) ..............................................................28

*South Carolina v. Katzenbach,*
  383 U.S. 301 (1966) .............................................................................33

*State ex rel. McNary v. Stussie,*
  518 S.W.2d 630 (Mo. 1974) ................................................................30

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
  600 U.S. 181 (2023) ................................................... 15, 21, 22, 24

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ...................................................................... 24, 28

*Tex. Democratic Party v. Abbott,*
  978 F.3d 168 (5th Cir. 2020) ................................................ 30, 33, 37, 42

*Tully v. Okeson,*
  78 F.4th 377 (7th Cir. 2023)..........................................................*passim*

*United States v. Carrillo-Lopez,*
  68 F.4th 1133 (9th Cir. 2023) ........................................................ 45, 53

*Villiarimo v. Aloha Island Air, Inc.,*
  281 F.3d 1054 (9th Cir. 2002) ............................................................. 26

*Walgren v. Howes,*
  482 F.2d 95 (1st Cir. 1973) ........................................................... 35, 41

*Walgren v. Bd. of Selectmen of Town of Amherst,*
  519 F.2d 1364 (1st Cir. 1975) ............................................................ 35

*Wounded Head v. Tribal Council of Oglala Sioux Tribe of Pine Ridge Rsrv.,*
  507 F.2d 1079 (8th Cir. 1975) ............................................................ 30

*Zellmer v. Meta Platforms, Inc.,*
  104 F.4th 1117 (9th Cir. 2024) .......................................................... 13

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I .................................................................................. 33

U.S. Const. amend. XV ........................................................................ 32

U.S. Const. amend. XXIV ..................................................................... 31

U.S. Const. amend. XXVI ............................................................... 15, 30

Idaho Const. art. I .............................................................................. 10

## STATUTES

1890-91 Idaho Sess. Laws ................................................................. 3, 39

1913 Idaho Sess. Laws ch. 92 ................................................................ 3

1970 Idaho Sess. Laws ch. 140 .............................................................. 4

2010 Idaho Sess. Laws ch. 246 .............................................................. 6

2017 Idaho Sess. Laws ch. 132 .............................................................. 6

2023 Idaho Sess. Laws ch. 27 ................................................................ 7

2023 Idaho Sess. Laws ch. 293 .............................................................. 7

2024 Idaho Sess. Laws ch. 31 ................................................................ 7

Idaho Code § 34-104 ............................................................................ 5

Idaho Code § 34-404 ............................................................................ 7

Idaho Code § 34-407 ........................................................................ 5, 26

Idaho Code § 34-408 ............................................................................ 7

Idaho Code § 34-408A ................................................................................ 5, 7, 46

Idaho Code § 34-409 .................................................................................... 6, 46

Idaho Code § 34-410 ................................................................................ 5, 7, 46

Idaho Code § 34-411 ............................................................................5, 7, 37, 46

Idaho Code § 34-1002 .......................................................................................... 5

Idaho Code § 34-1012 .......................................................................................... 5

Idaho Code § 34-1113 .............................................................................. 6, 7, 37

Idaho Code § 34-1114 ............................................................................ 6, 25, 46

Idaho Code § 49-2444 ................................................................................... 7, 37

N.D. Cent. Code § 16.1-01-04.1 .........................................................................48

Ohio Rev. Code § 3501.01 ...................................................................................48

S.C. Code § 7-13-710 ...........................................................................................48

Tenn. Code § 2-7-112 ...........................................................................................48

Tex. Elec. Code § 63.0101 ....................................................................................48

## OTHER AUTHORITIES

CBS2 News Staff, *Early voting opens in Ada County*, Idaho News (Oct. 15, 2024)...........40

*Central Issuance Brochure*, Idaho Transp. Dep't .......................................................8

*CWI Rolls Out New ID Cards,* Coll. of W. Idaho .....................................................9

*DMV Free ID for Voting*, Idaho Transp. Dep't ..........................................................8

*Election Results*, Vote Idaho ...............................................................................51

*Get Your Bengal ID*, Idaho State Univ.......................................................................9

H.B. 340, 67th Leg., 1st Reg. Sess. (Idaho 2023) .......................................................6

House State Affairs Committee Meeting, Rep. Tina Lambert,
   (Feb. 16, 2023) ............................................................................................. 47, 49

*Idaho Resident Population and Apportionment of the U.S. House of Representatives*,
   U.S. Census Bureau ..........................................................................................4

Louise Firestone, Direct Women.............................................................................23

*Next Generation Passports*, U.S. Dep't of State........................................................8

*Next Generation Uniformed Services ID Card*, Dep't of Def. .....................................8

Our Team, March for Our Lives, https://tinyurl.com/dfxe8uka ....................................23

Voting Rights Act Amendments of 1970, Pub. L. 91-285, 84 Stat. 314 .......................29

Registering to Vote, Vote Idaho ..........................................................................40

*Same-Day Voter Registration*, National Conference of State Legislators
  (Oct. 25, 2024) ..............................................................................................40

Senate State Affairs Committee Meeting, Testimony of Phil McGrane
  (Feb. 24, 2023) ..............................................................................................49

Senate State Affairs Committee Meeting, Senator Scott Herndon
  (Feb. 24, 2023) ..............................................................................................49

*Star Card*, Idaho Transp. Dep't ...........................................................................8

*Table 1: States with No-Excuse Absentee Voting*, National Conference of State Legislators
  (Dec. 20, 2023) ..............................................................................................40

*Tribal ID Cards as Identification*, Wash. State Liquor and Cannabis Bd. ...........................8

# INTRODUCTION

If elections "are to be fair and honest," "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring [them]." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (cleaned up). Setting rules to structure elections "will invariably impose some burden upon individual voters," but it would "tie the hands of States seeking to assure that elections are operated equitably and efficiently" if every law were subject to strict scrutiny or a searching inquiry of legislative intent. *Id.*

Idaho strives to make its elections equitable and efficient, and voting in Idaho has never been easier—the State offers expanded early voting and absentee voting, same-day and online voter registration, and a wealth of easy-to-understand voting guidance online. At the same time, Idaho's elections have never been more secure— the State has implemented a host of regulations and controls to ensure that votes are tabulated accurately and without fraud.

H.B. 340 and H.B. 124 are the State's latest efforts to improve its elections. The laws reduce the burden on voters by harmonizing voter identification requirements across various methods of registering and voting, creating a single list of reliable documents that everyone can use to verify identity in any electoral setting. However, the Idaho Legislature determined that student IDs were not sufficiently reliable to make the list—the standards for procuring student IDs vary widely from school to school, and the cards lack basic means to prevent falsification. So the Legislature excluded

student IDs, but at the same time authorized the State to issue no-fee identification cards to make sure nobody would be left without a proper identification to vote.

The State was sued anyways. The plaintiffs don't know anybody who has had difficulty voting based on the new laws and they've incurred no costs themselves, but they still argue that the laws abridge the right of young people to vote in violation of the Twenty-Sixth Amendment by requiring a limited number of students (who skew younger) to go to the DMV to get an identification card—the same thing every other voter must already do. Requiring this routine government interaction before voting does not constitute an abridgement of anyone's rights, and there is *zero* evidence the laws were enacted to prevent young people from voting.

The Court should affirm.

## STATEMENT OF THE CASE

## I.    Idaho Regulates Elections to Make Them Secure and Accessible.

Verifying voter identity used to be more straightforward "[i]n the old days and in small towns where everyone knows each other." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 208 (2008) (plurality). But in an era "where 40 million people move each year" across the country and there are "urban areas where some people do not even know the people living in their own apartment building let alone their precinct," ensuring voter identity and qualifications has become more complex. *Id.* As rapid growth has occurred, Idaho has continued to fine-tune the process of registering and voting while striving to balance two overarching goals: (1) ensure the accuracy,

correctness, and integrity of the voter rolls, and (2) make registering and voting as easy as possible.

In 1890, during its first legislative session, the Idaho Legislature enacted a law requiring voters to be "duly registered" before being allowed to vote. 1890-91 Idaho Sess. Laws at 57-58, 83. To register, a "qualified elector" had to (1) be a United States citizen residing in Idaho for at least six months before the election and (2) take an oath in person before the registrar of electors attesting to his qualifications (age, residency, criminal history, etc.). *Id.* at 58, 69-70. On election day, a voter gave the election clerk his name and residence. *Id.* at 81. The clerk checked that the name was on the registration list, then "announce[d] the [name] in a loud and distinct tone of voice." *Id.* If anyone at the polling place challenged the potential voter as unqualified, an election judge on site would question the voter. *Id.* at 83-86. These questions could generally be resolved by the voter swearing again to his qualifications. *Id.*

The State made only minor changes to the registration and voter verification process over the following decades. In 1913, the State made it so previously registered voters would not have to re-register for each election. 1913 Idaho Sess. Laws ch. 92, § 1. The 1913 amendment also required new voters to register two weeks before an election, but it authorized same-day registration if the voter was "identified and vouched for by some freeholder in such precinct" willing to swear a prescribed oath. *Id.* §§ 3, 4.

By 1970, Idaho had grown to more than 713,000 residents—up from just over 88,000 residents in 1890—and needed a new regulatory regime for elections to match

its expanded population.[1] It overhauled its entire election code and established the same basic system that is still in use today. The new system gave the Secretary of State a more prominent, centralized role in overseeing the work of county clerks across the State, 1970 Idaho Sess. Laws ch. 140, §§ 17–21, and expanded the ability to vote by authorizing absentee ballots and mail-in registration in certain circumstances. *Id.* §§ 45, 162.

At the same time, the State sought to introduce more uniformity and rigor into verifying voter qualifications. Registrants were required to supply much of the same information as before, but also some new information (social security number) and documentation in some circumstances (citizenship papers for naturalized citizens). *Id.* § 46. If the registration official was not satisfied based on "the evidence before him" that the registrant was qualified to vote, there would be a hearing to take additional evidence. *Id.* § 47. The 1970 amendment preserved the election day procedures of voters giving their name and residence, but the Secretary of State was directed to prepare a handbook with standardized "test questions" for election officials to ask voters if the voters' qualifications were challenged. *Id.* §§ 178, 183–84.

Over ensuing years, Idaho continued to broaden access to the ballot—it lowered its residency requirement to 30 days living in the State, rolled out an expansive early

---

[1] *Idaho Resident Population and Apportionment of the U.S. House of Representatives*, U.S. Census Bureau, https://tinyurl.com/3y6zw6tk.

voting program, and widened access to absentee ballots. Idaho Code §§ 34-104, 34-1012, 34-1002. And once again, the State accompanied its expansion of voting access with enhanced security measures to ensure election integrity and regularity.

As far as registration requirements, the changes came piecemeal, resulting in several different sets of requirements that depended on the way in which a person attempted to register. As of 2023, before the laws at issue in this case were passed, there were at least four distinct routes:

- Same day registration – In 1994, Idaho expanded its election-day registration rules to allow registration with (1) a driver's license or Idaho identification card, (2) a document with an address together with a photo identification, or (3) an Idaho post-secondary student photo identification card together with a current student fee statement listing an address. Idaho Code § 34-408A (2022).

- In-person registration – In 2003, Idaho amended the requirements for in-person registration to comply with the federal Help America Vote Act. It required those registering in person to provide (1) a driver's license number, (2) an Idaho identification card number, or (3) the last four digits of the applicant's social security number—but did not require a photo identification. Idaho Code §§ 34-407, 34-411 (2022).

- Mail-in registration – Idaho also updated its mail-in registration requirements in 2003 to comply with the Help America Vote Act. Those registering to vote for the first time in Idaho via mail would be required (either at the polls or with an absentee ballot) to show (1) "[a] current and valid photo identification," or (2) a bill, bank statement, or government document showing the applicant's name and address. Idaho Code § 34-410 (2022). Because any "current and valid identification" was permitted, an applicant could presumably register with a Costco card or fitness membership so long as it included a photograph.

- Online registration – In 2016, Idaho authorized online registration. Online registration could only be done with a driver's license or Idaho identification

5

card so the State could verify the person's identity with the Idaho Transportation Department. Idaho Code § 34-409 (2022).

As for election-day verification, Idaho adopted a photo identification requirement in 2010 after the Supreme Court approved of their use in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008); 2010 Idaho Sess. Laws ch. 246, § 1. Instead of using the list of acceptable ID documents from any of its registration laws, the State gave voters four options: (1) an Idaho driver's license or identification card, (2) a United States passport or identification card, (3) a tribal identification card, or (4) an Idaho high school or post-secondary student identification card. Idaho Code § 34-1113 (2022).[2] It also permitted a registered voter to sign an affidavit at the polls swearing to her name and address in lieu of showing photo identification—the idea being that "the person had already previously shown identification at the time they registered to vote." SER-60; Idaho Code § 34-1114 (2022).

## II.    Idaho Amends Its Voter Identification Laws to Provide Uniformity and Enhance Reliability.

In 2023, Idaho set out to "address the differing methods of registering to vote and voting in person" by creating a single list of reliable identification documents that would be accepted for both purposes. SER-27. The goal was to "bring greater uniformity to voter registration administration"—a boon to voters and poll workers alike—while "protect[ing] the integrity of the election process." SER-27; H.B. 340, 67th

---

[2] Concealed weapons licenses were added in 2017. 2017 Idaho Sess. Laws ch. 132, § 1.

Leg., 1st Reg. Sess. (Idaho 2023) ("H.B. 340 Statement of Purpose"), https://tinyurl.com/6axs3vfp (H.B. 340 would "clarify and create uniformity in voter registration requirements"); SER-63, 66.

The Legislature accomplished its goals by enacting two "companion" pieces of legislation—H.B. 340 and H.B. 124. 2023 Idaho Sess. Laws chs. 27, 293; ER-87.[3] Now, for any method of registration (H.B. 340) and for voting (H.B. 124), citizens must show (1) a driver's license, (2) a passport or other photo-identification issued by the federal government, (3) a tribal identification card, or (4) a concealed weapons license. Idaho Code §§ 34-404(1), 34-408(3), 34-408A, 34-410(6), 34-411(3), 34-1113. To make sure no voter would be left without an acceptable form of identification, H.B. 340 also instructed the Idaho Transportation Department to issue new "no-fee identification card[s]" to individuals 18 or older who indicate that the card "is needed to comply with voter registration or voting requirements." Idaho Code § 49-2444(22).[4]

However, the Legislature determined that student IDs from high schools and universities lacked basic standards for "uniformity," "sophistication," and security, and excluded them from the list of "acceptable form[s] of personal identification." H.B. 124, 67th Leg., 1st Reg. Sess. (Idaho 2023) ("H.B. 124 Statement of Purpose"),

---

[3] H.B. 124 was introduced on the same day as H.B. 126, and H.B. 126 was later modified and re-introduced as H.B. 340. *See* https://tinyurl.com/3ynxyjrx; ER-87.

[4] H.B. 340 originally excluded individuals who had "possessed a current driver's license in the preceding six (6) months" from obtaining a no-fee identification card, but that limitation was removed in 2024. 2024 Idaho Sess. Laws ch. 31, § 1.

https://tinyurl.com/y836pnet. And it is not difficult to see why. Here are the forms of identification that the Legislature decided to accept:[5]

 

 

 

---

[5] *Star Card*, Idaho Transp. Dep't, (https://tinyurl.com/mwvweaxh); *DMV Free ID for Voting*, Idaho Transp. Dep't, (https://tinyurl.com/2vhh8ys4); *Next Generation Passports*, U.S. Dep't of State (https://tinyurl.com/u4zw5z2m); *Central Issuance Brochure*, Idaho Transp. Dep't, (https://tinyurl.com/yc7ww6t4); *Next Generation Uniformed Services ID Card*, Dep't of Def., (https://tinyurl.com/ya5cthmm); *Tribal ID Cards as Identification*, Wash. State Liquor and Cannabis Bd., (https://tinyurl.com/3wfuaxd6).

And here is what some student IDs look like:[6]

 

Beyond considerations apparent from the face of the student IDs—like the lack of a seal or watermark to prevent easy falsification by anyone with a printer—the (highly variable) process for obtaining student IDs from Idaho secondary or post-secondary schools undermines their reliability for verifying a voter's identification. Some schools allow students to use preferred names or nicknames on their student ID. SER-70, 81, 86, 90. Some allow students to upload their own photo. SER-81, 85, 94. Some don't require students to present any government-issued identification when obtaining their student ID—and the card contains a "Not for Official Identification" disclaimer as a result. SER-89.

It's understandable that schools don't have rigorous identification standards for student IDs. The primary purpose of those cards is not to identify a person for official government purposes, but for on-campus purposes, like accessing facilities and events or holding funds for on-campus use. SER-77, 82, 86, 90, 95, 99. H.B. 340 and H.B. 124

---

[6] *Get Your Bengal ID*, Idaho State Univ., (https://tinyurl.com/yfxy99pk); *CWI Rolls Out New ID Cards,* Coll. of W. Idaho, (https://tinyurl.com/3vrys48p).

recognize the importance of accurately identifying a person at the polls and the insufficiency of student IDs in accomplishing that task.

The Legislature expected minimal impact from eliminating student IDs as a method to verify voters' identity. The data before the Legislature showed that only *104 voters* across 30 of Idaho's 44 counties used a student ID to vote in 2022 (including 59 young voters). H.B. 124 Statement of Purpose, SER-19-23. That means less than 0.5% of all *young* voters ages 18-24 and less than 0.02% of all voters used a student ID. SER-19-23. Those 104 voters would not need to re-register and could vote by signing an affidavit or using some other form of identification—perhaps a driver's license like 99% of Idaho voters used in the 2022 November election, *see* SER-21 (378,874 out of 383,658), or a no-fee identification card.

## III. Several Organizations Challenge H.B. 340 and H.B. 124.

Within two days of H.B. 124 being signed into law, four organizations filed lawsuits against Idaho Secretary of State Phil McGrane to enjoin the law—one in state court and one in federal court. Both amended their complaints to challenge H.B. 340 too when it was signed into law a few weeks later.

First, on March 16, 2023, BABE Vote and the League of Women Voters—*amici* in this Court, *see* Dkt. 28—challenged H.B. 340 and H.B. 124 in Idaho state court, alleging that the laws discriminated against young voters and "out of state students" in violation of the Equal Protection Clause and "right to suffrage" in Idaho's Constitution. Idaho Const. art. I, §§ 2, 19. Those arguments were rejected in trial court and the Idaho

Supreme Court. *BABE VOTE v. McGrane*, 546 P.3d 694, 710-13 (Idaho 2024) (there was "no assertion that House Bills 124 and 340 'annul' the people's right of suffrage"; they merely "prohibit[] some forms [of identification] deemed unreliable" without imposing a "serious" burden to voting).

Second, on March 17, 2023, two other organizations—March for Our Lives Idaho (MFOL) and Idaho Alliance for Retired Americans (Alliance)—initiated this action in federal court. ER-146. The operative complaint raises three claims under the United States Constitution: (1) violation of the Twenty-Sixth Amendment by discriminating against young voters, (2) violation of the Twenty-Fourth Amendment by effectively imposing a poll tax, and (3) violation of the Equal Protection Clause by discriminating against "new registrants as compared with existing voters." ER-129-36.

Secretary McGrane moved to dismiss the complaint on jurisdictional grounds, and that motion was denied. ER-148. The parties then conducted discovery, and on November 17, 2023, Secretary McGrane moved for summary judgment. ER-150.

The district court granted Secretary McGrane's motion for summary judgment in full. It started by concluding that MFOL had organizational standing to raise its claims based on a "diversion of resources." ER-10-14.

On the merits, the district court rejected all of plaintiffs' claims. ER-15-31. On their Twenty-Sixth Amendment challenge, the court held that the "right to vote" is only "abridged"—as those terms were understood when the Amendment was ratified—by "'the imposition of a material requirement' on the right to vote." ER-15-19 (quoting

*Tully v. Okeson*, 78 F.4th 377, 382 (7th Cir. 2023)). The minimal burdens imposed by H.B. 340 and H.B. 124—that is, having to obtain an alternative (and free) form of identification other than a student ID—did not qualify as material. *Id.*

Nor had the plaintiffs presented evidence to even "suggest" that the Legislature passed H.B. 340 and H.B. 124 with an "intent to discriminate against young voters." ER-19-21. The court held that the Legislature had legitimate reasons for excluding student identification cards based on their "lack of uniformity and sophistication" and the "widely" "vary[ing]" standards among schools to obtain a student ID. ER-20-21. Moreover, any disparate impact on young voters was minimal given the ease of obtaining a new form of identification. ER-20.

The district court also rejected plaintiffs' remaining claims. H.B. 340 and H.B. 124 do not constitute a poll tax under Ninth Circuit precedent because "[r]equiring voters to show identification at the polls does not constitute a tax." ER-23 (quoting *Gonzalez v. Arizona*, 677 F.3d 383, 408 (9th Cir. 2012)). On Equal Protection, the district court concluded that H.B. 340 and H.B. 124 comfortably survived the *Anderson-Burdick* balancing test for election regulations. The laws do not impose a "severe" burden on voting—i.e., the burden of "travel[ing] to the department of motor vehicles office" to obtain a no-fee identification card—and were justified by the "important interests of election security and prevention of voter fraud." ER-29-30.

The plaintiffs appeal only the district court's Twenty-Sixth Amendment ruling. Opening Br. at 6.

## STATEMENT OF THE ISSUES

1. Does MFOL have standing to challenge H.B. 340 and H.B. 124?

2. Do H.B. 340 and H.B. 124 impose a "material burden" on the right to vote by requiring voters who would otherwise verify their identity with a student ID to acquire a no-fee identification card instead?

3. Have the plaintiffs submitted evidence that H.B. 340 and H.B. 124 were enacted with an intent to impede young voters from voting, or should the presumption that the Idaho Legislature acted in good faith hold?

## STANDARD OF REVIEW

This court "review[s] a summary judgment ruling de novo." *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1121 (9th Cir. 2024). "Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Nation v. City of Glendale*, 804 F.3d 1292, 1297 (9th Cir. 2015) (quoting Fed. R. Civ .P. 56(a)). "[T]he nonmoving party may not rest upon mere allegations or denials of his pleading, but must set forth specific facts"—amounting to more than "a scintilla of evidence"—"showing that there is a genuine issue for trial." *Zellmer*, 104 F.4th at 1122 (cleaned up).

## SUMMARY OF THE ARGUMENT

The plaintiffs lack standing to challenge H.B. 340 and H.B. 124, and their arguments are meritless in all events.

13

**I.** MFOL—the only plaintiff claiming standing—lacks organizational standing because it has not suffered any injury in its own right. It asserts that it incurred costs by having to understand H.B. 340 and H.B. 124 and communicate their content to its constituents. But MFOL is a voter education group, so spreading voter information is merely business as usual, not a cognizable legal harm. MFOL also claims it will have to drive potential registrants to the DMV to get a no-fee identification card, but that claim is purely speculative in light of admissions MFOL has made in this case.

MFOL also lacks associational standing to challenge H.B. 340 and H.B. 124 on behalf of its members. For starters, it doesn't have members, it has "constituents" with no acknowledged relationship with the organization. That's not good enough, especially under recent Supreme Court precedent. Even if these constituents could be considered members, MFOL has not named anyone who has been affected by H.B. 340 or H.B. 124, and it is not reasonably likely based on the record that any of them will be affected.

**II**. On the merits, the plaintiffs' Twenty-Sixth Amendment claim fails because they have not shown that H.B. 340 and H.B. 124 impose a material impediment to voting. As the Supreme Court has explained in other contexts, and as other circuits have concluded, the right to vote is "abridged" only by a "material" obstacle to voting. And the inconvenience of traveling to the DMV to obtain a no-fee identification card is not material.

**III**. Even assuming H.B. 340 and H.B. 124 do impose a material burden constituting an "abridgement," there's no indication that the Legislature imposed that

14

burden "on account of age." Generally, there is a presumption of legislative good faith, and every reasonable factfinder would conclude that the presumption holds here in light of (1) the copious evidence that the Legislature intended to pursue legitimate aims, and (2) the absence of any evidence that the Legislature intended to impede young voters.

ARGUMENT

The Twenty-Sixth Amendment states that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI. By its plain text, the Amendment is violated only if: (1) there is a denial or abridgement of the right to vote, and (2) the denial or abridgement occurs on account of age.

H.B. 340 and H.B. 124 effected no denial or abridgement of the right to vote and were not enacted on account of age, and the plaintiffs lack standing to challenge those laws in the first place.

## I. The Plaintiffs Lack Standing.

While the district court was right to reject all the plaintiffs' claims on the merits, it never should have reached the merits because the plaintiffs lack standing.

To establish Article III standing, a plaintiff must establish three traditional elements—(1) there is an injury in fact, (2) the injury is fairly traceable to the challenged conduct of the defendant, and (3) the injury is likely to be redressed by a favorable judicial decision. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) ("*SFFA*"). For organizations, standing comes in two flavors—

15

organizational standing, i.e. vindicating an "injury in its own right," or associational standing, i.e. "standing solely as the representative of its members." *Id.* (cleaned up). In either case, the plaintiffs "bear[] the burden of establishing" the elements of standing, and the injury must be "likely, as opposed to merely speculative." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up).

The plaintiffs argue only that MFOL has standing, not the Alliance. Opening Br. at 12. That makes sense—the Alliance for *Retired* Americans surely has not been harmed in any way relevant to a claim of discrimination against *young* voters. This brief therefore addresses only MFOL's (lack of) standing.

## A. MFOL lacks organizational standing.

"Like an individual, an organization may not establish standing simply based on the intensity of [its] interest or because of strong opposition to the government's conduct." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) (cleaned up). That's true "no matter how longstanding the [organization's] interest and no matter how qualified the organization." *Id.* Rather, to establish an injury for purposes of organizational standing, the organization must show a harm caused by the government's conduct that is "actual or imminent," "personal," and "not speculative." *Id.* at 381. That task is "ordinarily substantially more difficult" when the organization "challenges the government's regulation (or lack thereof) of *someone else*," and is not satisfied by an organization's claim that it "divert[ed] its resources in response to a defendant's actions." *Id.* at 382, 395 (emphasis in original).

16

MFOL's sole theory of organizational standing (at 13) is based on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), as recently clarified by *Alliance for Hippocratic Medicine*, 602 U.S. at 394-96.[7] In *Havens*, an organization engaged in housing counseling and referral services had standing to sue an apartment owner that had given false information about apartment availability to impede black renters from seeking occupancy. 602 U.S. at 395. The organization had been injured because the false information "directly affected and interfered with [its] core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* The Court cautioned that *Havens* was an "unusual case" that the Court has been "careful not to extend … beyond its context." *Id.* at 396.

MFOL argues that it has a core business activity of helping voters register, and that H.B. 340 and H.B. 124 directly affect and interfere with that activity by making it "harder" to help these voters. Opening Br. at 13-18. Specifically, MFOL claims the following additional burdens (at 14):

(1)  "reaching out to DMV offices for guidance about other forms of alternative identifications"—which included calling the DMV once, leaving a message, and quickly finding the requested information online, SER-49-50;

(2)  "creating new voter education materials"—i.e., posting a single graphic on Instagram, SER-51-52;

---

[7] MFOL also discusses *Arizona Alliance for Retired Americans v. Mayes*, 117 F.4th 1165 (9th Cir. 2024), which examined *Havens* and *Alliance for Hippocratic Medicine*. But after the opening brief was filed, this Court vacated *Arizona Alliance* upon granting a petition to rehear the case *en banc*. 2025 WL 843314.

(3)     "re-training volunteers to educate constituents about the new voter registration requirements"; and

(4)     "helping constituents obtain acceptable identification (including driving them to the DMV and helping pay for the cost of a new identification card)."

These are not sufficient to establish organizational standing.

The first three claimed burdens all suffer from the same defect—they are not interferences with MFOL's business activities, they *are* MFOL's business activities. To perform its core activity of helping voters register, MFOL must necessarily (1) read and understand the law regulating voter registration, then (2) convey that information to those it helps. It's not an injury for MFOL to do the very thing it was designed to do— rather, it's "business as usual." *Am. Diabetes Ass'n v. United States Dep't of the Army*, 938 F.3d 1147, 1155 (9th Cir. 2019) (not an organizational injury for staff attorney to perform ordinary job duty of answering a phone call). If a group like MFOL is injured by the law changing, then so is everyone whose job duties include conveying information about the law, including news outlets, publishers of legal reporters, and law professors.

In other words, MFOL's law-conveying "burdens" are unlike *Havens*. The situation is not like a retailer receiving "defective goods"—it's like a retailer receiving functioning goods and then complaining that it has to sell them. *All. for Hippocratic Med.*, 605 U.S. at 394–95 (rejecting organizations' claim of injury from action making it "more difficult for them to inform the public about safety risks" or engage in "public education"). The Idaho

18

Supreme Court, applying *Havens*, rejected this standing theory for the same reason when advanced in the state court challenge to H.B. 340 and H.B. 124, though it ultimately allowed the claims there to proceed based on an Idaho-specific "relaxed" standing doctrine. *BABE Vote*, 546 P.3d at 706 ("the mission of these organizations *is* voter education … educating voters about the need to produce identification at the polls is not a new harm; it is part of the organizations' mission"); *see* SER-47 ("voter education" part of MFOL's mission).

MFOL's fourth claimed burden fares no better. Factually, its alleged injury is a non-starter. Its lone evidence that it will "will have to divert resources" at some point "to drive [constituents] to the DMV" is a declaration from a MFOL leader stating as much, ER-102, but MFOL has never suggested that it has "actual[ly]" driven anyone to the DMV. *All. for Hippocratic Med.*, 605 U.S. at 381. The record indicates that a trip to the DMV is not "imminent" either, *id.*—MFOL has admitted that the organization is not aware of anyone (much less a young voter) who has "had problems getting to the DMV in order to obtain a free voter ID," has had "difficulty obtaining a free voter ID," or who has otherwise "been unable to register to vote because they lacked" an acceptable identification. SER-46, 48, 54-55. The assertion that MFOL will someday drive someone to the DMV is purely "speculative," and certainly not good enough survive at the summary judgment stage. *Lujan*, 504 U.S. at 561.

The same goes for MFOL's half-hearted suggestion that "perhaps" it will pay for a constituent to obtain a new form of identification. ER-102. It's unclear why MFOL

believes it would have to pay for anyone's identification for them to vote—the no-fee identification does not cost money, and to the extent MFOL wants to pay for its constituents to obtain an Idaho driver's license instead of a no-fee identification, that cost is not "fairly traceable" to H.B. 340 or H.B. 124. *Lujan*, 504 U.S. at 560 (cleaned up).

In any event, MFOL's hypothetical costs would not be enough even if they were imminent because H.B. 340 and H.B. 124 do not cause MFOL to incur them. MFOL is not "directly" affected by these laws, only voters are, *All. for Hippocratic Med.*, 602 U.S. at 395, so MFOL is not "forced to choose between suffering an injury and diverting resources to counteract the injury." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 n.4 (9th Cir. 2010). It can avoid injury altogether by simply continuing registering those who have the necessary documents without taking voters to the DMV.

## B. MFOL lacks associational standing.

MFOL also asserts (at 18-22) that it has associational standing to challenge H.B. 340 and H.B. 124—an argument the district court did not reach below. Associational standing permits an organization to sue on behalf of injured members where (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). MFOL

can't get past the first element—there is no evidence it has members who could sue in their own right, or even any members *at all*.

### 1.  MFOL does not have members.

MFOL's attempt to sue on behalf of injured members stumbles out of the blocks because MFOL does not have any members "in the sense required by the doctrine." *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1106 (9th Cir. 2006).

Associational standing is a "form of third-party standing" because it allows an organization to pursue the claim of a member who is not before the court. *All. for Hippocratic Med.*, 602 U.S. at 398 (Thomas, J., concurring). And while the Supreme Court has "never explained or justified" associational standing as an originalist matter, *id.*, the concept seems to reflect the general third-party standing principle allowing a plaintiff with a "close relationship" to "the person who possesses the right" being asserted to vindicate that right in court. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (cleaned up).

To ensure the requisite close relationship, the Supreme Court has recently clarified that the individuals whose injuries are being vindicated by associational standing must have "effectively" a membership relationship with the organization. *SFFA*, 600 U.S. at 200 (emphasis omitted). Formal membership titled as such is not required, but there must at least be enough "indicia of membership" to demonstrate that the organization is a "genuine membership organization in substance." *Id.* Such indicia include that those represented by the organization exclusively "elect[] the members" of leadership, "serve[] on" leadership, and "finance[] [the organization's]

activities"—in other words, they have "come together to form an organization for their mutual aid and benefit." *Id.* (quoting *Hunt*, 432 U.S. at 344) (first three quotes); *Fleck*, 471 F.3d at 1106 (last quote).

MFOL looks nothing like a "genuine membership organization." *SFFA*, 600 U.S. at 200. It doesn't even attempt to call those it seeks to represent in court its members, opting instead to call them "constituents." Opening Br. at 18-22. It says its constituents are "young Idahoans concerned about gun violence," Opening Br. at 18; ER-100, but that group of individuals is *enormous*—surely, the vast majority of Idaho's young citizens (and even its older citizens) hope for gun violence to decrease.

This massive swath of the population has not "come together" to "express [their] collective views" through MFOL. *Fleck*, 471 F.3d at 1106 (cleaned up). They have vastly divergent views on *how* to address gun violence, and surely even more so on how to address voter identification. Many of these individuals do not know that MFOL even exists, and fewer still know that it is attempting to represent their interests in court.

Confirming this commonsense result, MFOL's "constituency" lacks any indicia of membership. There is no evidence that young Idahoans concerned about gun violence collectively select the leadership of MFOL or finance the organization's activities. MFOL asserts that its board consists of "eight young activists," ER-100, but it does not say who chooses those board members, and it appears that the organization

is also run by non-constituents.[8] MFOL looks nothing like the state apple advertising commission in *Hunt*, where Washington apple growers "alone" controlled the commission, and the commission functioned like "a traditional trade association representing the Washington apple industry." 432 U.S. at 344.

At bottom, MFOL is simply an advocacy group advancing its own interests. It does not represent constituents and is not influenced by constituents; rather, it seeks to influence those it claims as constituents. Allowing MFOL to assert standing on behalf of people with whom it has no relationship and who may disagree with its voter identification positions would permit anyone with an "abstract social interest" to sue in court by claiming their suit serves the interests of some actually injured third parties they have never met. *All. for Hippocratic Med.*, 602 U.S. at 394 (cleaned up). Article III demands more.

Ninth Circuit precedent does not allow MFOL to assert associational standing either. MFOL cites *America Unites for Kids v. Rousseau*, but the organization there supplied evidence of a close relationship with an individual whose interests it sought to represent—it presented the declaration of an actually injured person indicating that she believed the organization represented her interests, which MFOL has not done with

---

[8] *See* Our Team, March for Our Lives, https://tinyurl.com/dfxe8uka, (last visited Apr. 9, 2025) (including non-"young" voters on the board of directors); Louise Firestone, Direct Women, https://tinyurl.com/4t88mfcc, (click "Download Resume") (MFOL board member Louise Firestone graduated law school in 1985).

anyone in its sprawling and diverse constituency. 985 F.3d 1075, 1097 (9th Cir. 2021). But beyond being distinguishable, *America Unites* is clearly irreconcilable with the Supreme Court's recent pronouncement that associational standing is available only for a "genuine membership organization in substance" representing what are "effectively members," *SFFA*, 600 U.S. at 200, and therefore does not bind the panel. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

## 2. MFOL has not identified any injured member with standing.

MFOL also cannot establish standing because it has failed to identify anyone among its "constituents" who has been injured by H.B. 340 or H.B. 124. This problem exacerbates the last problem—associational standing would *truly* be limitless if an interest group could claim a large segment of the population as its constituency (i.e., most of the youth in Idaho) *and* assert that some unidentified person among that group is probably injured. Standing is a foundational requirement of jurisdiction "built on separation-of-powers principles," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013), and a court exceeds its proper role if it rules in a case without knowing that there is a real person with a real claim that has some connection to the party in court.

For these reasons, the Supreme Court has made clear that associational standing "require[s] plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). So when an environmental group sued to stop a timber sale alleging that one of its 700,000 members surely would have visited the affected region,

the Court held that it would "make a mockery" of Article III to grant standing, and that the "requirement of naming the affected members has never been dispensed with in light of statistical probabilities." *Id.* at 497-99. This Court followed *Summers* shortly after it was decided by rejecting standing when an organization did "not identify any affected members by name." *Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013).

MFOL has not identified any injured "constituent." MFOL's Twenty-Sixth Amendment claim challenges H.B. 340 and H.B. 124's omission of student IDs as an acceptable form of identification to register and vote, and the only young voters who could possibly need to take additional steps to vote as a result are those who (1) possess a student identification, (2) do not possess any other acceptable form of identification, and (3) are not already registered. *See* Idaho Code § 34-1114 (registered voters can verify identity on election day via affidavit). Affected individuals would need to drive to the DMV, fill out a form, and take a picture before registering and voting.

However, MFOL has admitted that it doesn't know of any person meeting those criteria. Its representative conceded in a Rule 30(b)(6) deposition that MFOL is not "aware of any MFOL members who have been unable to register to vote because they lacked the ID required by H.B. 340," "have used student ID to vote in elections," "have had difficulty obtaining a free voter ID under the new laws," or have "had problems getting to the DMV in order to obtain a free voter ID." SER-45, 46, 48, 54-55.

Following these devastating concessions, MFOL submitted a declaration from one of its leaders—not any affected young voter—stating generically that "[a]t least some of MFOL Idaho's constituents do not have a driver's license and had previously relied on their student identification cards in order to register to vote or vote." ER-101. But that declaration *still* does not give a name. And the people the declaration describes are not harmed because they are already registered and can continue to vote by affidavit without procuring any additional identification. In any event, summary judgment on standing would still be proper because "[t]he general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (cleaned up); *see* SER-45 (admitting that MFOL does not "keep track of" the form of identification its claimed members use to vote).[9]

It's no surprise that MFOL cannot find any individual affected by H.B. 340 and H.B. 124. SER-19 (counting only 59 young voters who used a student ID to vote in 2022). But the difficulty of finding an affected individual does not excuse MFOL from the requirement of proving an injured member.

---

[9] *See also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1059 & n.5, 1061 (9th Cir. 2002) (no genuine issue of material fact presented by "self-serving and uncorroborated affidavit" that did not provide any "indication how [the affiant] kn[ew]" the facts therein to be true).

MFOL attempts to skate the demands of Article III articulated in *Summers* and *Associated General Contractors*, arguing that it need only show that it is "relatively clear" that some member (or constituent) will be harmed, even if it can't name one. The case MFOL cites does not—and could not, consistent with *Summers*—establish that rule. In *National Council of La Raza v. Cegavske*, this Court stated that it "s[aw] no purpose to be served" by requiring a named injured member if it was "relatively clear" and not "speculative" that a member would be harmed, but its comment is best understood as dicta questioning the wisdom of *Summers* rather than overruling *Summers*. 800 F.3d 1032, 1041 (9th Cir. 2015). *La Raza* ultimately rested on organizational standing, not associational standing. *Id.*

This Court recently repeated the "clear and not speculative" standard in *Mi Familia Vota v. Fontes*, but that case was also distinguishable. 129 F.4th 691, 708 (9th Cir. 2025). There, it was unquestioned that the organization's "1,043 dues-paying members" would vote in an election, and the issue (unresolvable before the election) was which members would be subject to "potentially arbitrary" citizenship checks at the polls pursuant to the challenged law. *Id.* Here, however, MFOL is claiming that its constituents are harmed based on the *present* application of the law—not the unknowable future application—and it still cannot find a single harmed individual.

To the extent *La Raza* (which does not cite *Associated General Contractors*) and *Mi Familia Vota* (which does not cite *Summers* or *Associated General Contractors*) stand for the proposition that an organization generally does not need to identify a harmed member

by name, then they are irreconcilable with *Summers* and *Associated General Contractors*, and the Court should follow those earlier cases. *Miller*, 335 F.3d at 900.[10]

Fortunately, the Court need not resolve the conflict because MFOL fails even under *Mi Familia Vota*'s "clear and not speculative" language. The only record evidence that anyone MFOL claims as a constituent has been affected by H.B. 340 and H.B. 124 is a vague reference in a declaration that contradicts the organization's deposition testimony. MFOL apparently hopes to rely on "statistical probabilities" (*Summers*, 555 U.S. at 498-99) to presume that *someone* in Idaho would otherwise vote using a student ID since some voters have done so previously, *see* SER-21, but (1) statistical probabilities are not good enough, and (2) it is unknown whether those past voters possessed another form of identification, or are among MFOL's "constituents."

\*     \*     \*

Under Article III, legal questions must be resolved "in a concrete factual context," not "in the rarified atmosphere of a debating society." *All. for Hippocratic Med.*, 602 U.S. at 379 (cleaned up). This case presents the classic debating-society scenario—MFOL ideologically opposes voter identification regulation, and filed its complaint two days after

---

[10] Every circuit after *Summers* has concluded that an organization must name and identify an injured member. *See Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 118 (2d Cir. 2024); *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 601 (8th Cir. 2022); *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1204 (11th Cir. 2018); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016); *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013); *N.J. Physicians, Inc. v. President of U.S.*, 653 F.3d 234, 241 (3d Cir. 2011).

H.B. 124 was signed into law without knowing whether any young voter the organization associates with was actually burdened. And after a full discovery period, it still knows of no person whose ability to vote has been affected, and cannot identify one concrete cost it incurred other than relaying the content of the new laws to its constituents. The Court should decline to hear MFOL's "generalized grievance." *Id.* at 381.

## II.   H.B. 340 and H.B. 124 Do Not Deny or Abridge the Right to Vote.

The plaintiffs' arguments on the merits of their Twenty-Sixth Amendment claim—the only claim they have appealed—are likewise doomed to fail. H.B. 340 and H.B. 124 do not abridge anyone's right to vote, and certainly do not do so on account of age.

With the Vietnam War came the resurrection of a slogan that first gained popularity during World War II—"Old enough to fight, old enough to vote."[11] In 1970, Congress made that slogan a reality by amending the Voting Rights Act of 1965 to make 18 years old the legal voting age for federal, state, and local elections. Pub. L. 91-285, 84 Stat. 314. However, that same year the statute was enjoined, as the Supreme Court held that Congress lacked the power to set the voting age for state and local elections. *Oregon v. Mitchell*, 400 U.S. 112, 117-18 (1970).

---

[11] The 26th Amendment, Richard Nixon Presidential Library and Museum, (June 17, 2021), https://tinyurl.com/2e8mfj5e.

Enter the Twenty-Sixth Amendment, which was ratified in 1971 to accomplish by constitutional amendment what Congress could not accomplish by ordinary legislation. The Amendment guarantees that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI.

In the years immediately following ratification, state and federal courts resolved peripheral questions about the new mandatory voting age. For example, does the Amendment guarantee 18-year-olds the right to sign initiative petitions? *Colo. Project-Common Cause v. Anderson*, 495 P.2d 220, 223 (Colo. 1972) (yes). Does it guarantee them the right to hold public office or be seated as jurors? *Opatz v. City of St. Cloud*, 196 N.W.2d 298, 301 (Minn. 1972) (no, public office); *State ex rel. McNary v. Stussie*, 518 S.W.2d 630, 637 (Mo. 1974) (no, jury service). Does it guarantee them the right to vote in tribal elections? *Wounded Head v. Tribal Council of Oglala Sioux Tribe of Pine Ridge Rsrv.*, 507 F.2d 1079, 1081 (8th Cir. 1975) (generally, no).

Once these basic questions were ironed out, the Amendment lay largely dormant over the next three or four decades. As a result, the Amendment "has yet to be interpreted in any significant depth," *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 183 (5th Cir. 2020), and has never been interpreted by the Supreme Court, leaving lower courts addressing Twenty-Sixth Amendment challenges that have recently cropped up "working, in essence, on a constitutional blank slate." *Tully v. Okeson*, 78 F.4th 377, 382 (7th Cir. 2023) ("*Tully II*").

30

Nevertheless, case law from similarly worded amendments regarding the "right to vote" and when that right has been "denied or abridged" is highly instructive when interpreting the Twenty-Sixth Amendment, even if it "is far from clear that the Twenty-Sixth Amendment should be read to create a cause of action that imports principles" from those amendments wholesale. *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 607 (4th Cir. 2016); Opening Br. at 24 (agreeing that other amendments should "guide the interpretation of the Twenty-Sixth Amendment"). That case law makes clear that the right to vote is abridged only where a law imposes a "material" impediment to voting—which H.B. 340 and H.B. 124 don't do.

## A.  The right to vote is abridged only by a "material" impediment to voting.

Supreme Court case law is uniform in demanding a "material" impediment to voting for an election regulation to constitute an abridgement of the right to vote.

Start with the Supreme Court's understanding of the Twenty-Fourth Amendment, which ensures that the "right … to vote" for certain federal offices "shall not be denied or abridged … by reason of failure to pay any poll tax or other tax." U.S. Const. amend. XXIV. In *Harman v. Forssenius*—decided just six years before the Twenty-Sixth Amendment was ratified[12]—the Court held that a Virginia law requiring voters to file a certificate of residence each election year if they didn't pay a poll tax "constitute[d]

---

[12] *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 42 (2022) (events closely preceding ratification inform Second Amendment's meaning).

an abridgment of the right to vote in federal elections." 380 U.S. 528, 538 (1965). The Court reasoned that the plaintiffs needed to show that the Virginia law "impose[d] a *material requirement*" on those who refuse to pay a poll tax, and that Virginia's "plainly … cumbersome" law was material because it required the certificate to be re-filed each election year at least six months before the election, be notarized or witnessed, make multiple attestations, and be filed in person. *Id.* at 541-42 (emphasis added); *see id.* (calling the certificate a "real obstacle to voting"); *see Gonzalez v. Arizona*, 677 F.3d 383, 408 (9th Cir. 2012) (relying on *Harman* and holding that voter identification law imposed no "material burden").

    *Harman* drew from cases interpreting the Fifteenth Amendment, which prohibits "the right … to vote" from being "denied or abridged … on account of race, color, or previous condition of servitude." *Harman*, 380 U.S. at 540-41; U.S. Const. amend. XV. In the Fifteenth Amendment context, the Supreme Court has held that the right to vote is abridged by "*onerous* procedural requirements which *effectively handicap* exercise of the franchise"—that is, machinations attempting to "manipulate[] out of existence" the right to vote. *Lane v. Wilson*, 307 U.S. 268, 275 (1939) (first quote) (emphases added); *Gomillion v. Lightfoot*, 364 U.S. 339, 345 (1960) (second quote) (cleaned up). Thus, the Court has struck down racially-motivated laws imposing burdensome requirements like 12-day registration windows (threatening the loss of voting rights forever if missed), literacy tests, and other voting tests. *Lane*, 307 U.S. at 275-77; *Guinn v. United States*, 238 U.S. 347, 367 (1915); *Louisiana v. United States*, 380 U.S. 145, 147-50 (1965).

The same principle is reflected in the Supreme Court's Equal Protection Clause jurisprudence protecting the "fundamental right to vote." *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 807 (1969). In *McDonald*—decided just two years before the Twenty-Sixth Amendment was ratified[13]—the Court held that an Illinois law denying absentee ballots to pretrial detainees did not implicate the fundamental right to vote because it appeared the State would still "furnish the jails with special polling booths or facilities on election day, or provide guarded transportation to the polls." *Id.* at 807-08 & n.6. That meant plaintiffs' challenge was really seeking to vindicate only a "claimed right to receive absentee ballots," so the law was subject to rational basis review. *Id.* at 807-10; *Bullock v. Carter*, 405 U.S. 134, 143 (1972) ("[N]ot every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review").

Requiring a material impediment to voting before subjecting a state law to heightened review makes sense. The Constitution gives States "broad powers to determine the conditions under which the right of suffrage may be exercised." *South Carolina v. Katzenbach*, 383 U.S. 301, 325 (1966) (cleaned up); U.S. Const. art. I, § 4 (States may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives"). Indeed, "[c]ommon sense, as well as constitutional law, compels the

---

[13] *Tex. Democratic Party*, 978 F.3d at 185 ("Understanding what the right to vote meant at the time the Twenty-Sixth Amendment was ratified in 1971 is certainly assisted by the 1969 *McDonald* decision.").

conclusion that government must play an active role in structuring elections" if those elections "are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick*, 504 U.S. at 433 (cleaned up).

Yet every election regulation "will invariably impose some burden upon individual voters." *Id.*; *Anderson v. Celebrezze,* 460 U.S. 780, 788 (1983) (every election law "inevitably affects—at least to some degree—the individual's right to vote"). And often, the burden will not be felt evenly among citizens—weekday elections favor retirees and stay-at-home parents, for example. *See Crawford*, 553 U.S. at 208 (Scalia, J., concurring) ("Very few new election regulations improve everyone's lot, so the potential allegations of severe burden are endless"). But it would "tie the hands of States seeking to assure that elections are operated equitably and efficiently" if every election regulation were subject to strict scrutiny or—as MFOL urges—a searching review of legislative intent. *Burdick*, 504 U.S. at 433.

## B. Other courts have required a "material" impediment to voting in the Twenty-Sixth Amendment context.

Lower courts addressing the Twenty-Sixth Amendment have widely followed these teachings from the Supreme Court, and have required a material burden to prove an abridgement of the right to vote. *See Padilla-Ramirez v. Bible*, 882 F.3d 826, 836 (9th Cir. 2017) ("As a general rule, we decline to create a circuit split unless there is a compelling reason to do so.") (cleaned up).

The most comprehensive decision on the Twenty-Sixth Amendment comes from the Seventh Circuit. There, the court considered the constitutionality of an Indiana statute creating an age-based entitlement to an absentee ballot only for voters 65 or older. *Tully II*, 78 F.4th at 379. The Seventh Circuit methodically analyzed the Supreme Court precedent laid out above and concluded that "an 'abridgement' must involve the imposition of a 'material requirement.'" *Id.* at 382-86 (cleaned up). It held that Indiana's law redressing "special barriers" uniquely faced by elderly voters "hardly create[d] a material burden on the exercise of the franchise by other citizens." *Id.* at 387.

The First Circuit has displayed the same understanding of the Twenty-Sixth Amendment. Shortly after the Amendment was ratified, the court addressed a challenge by 18- to 20-year-olds arguing that their right to vote had been abridged because a town election was held while students were on winter break. *Walgren v. Howes*, 482 F.2d 95, 97 (1st Cir. 1973) ("*Walgren I*"). The First Circuit directed the district court to consider whether the "burden [imposed was] of such a significant nature as to constitute an 'abridgement.'" *Id.* at 102 (noting that burden must be "not insignificant"); *id.* (noting the lack of a clear test for "when the burden is so selective and egregious on its face as to constitute an 'abridgement' per se"). On remand, the district court held that the election date was not "unconstitutionally onerous" because "many students could have voted in person without much expense or inconvenience" or used absentee ballots, and the First Circuit affirmed. *Walgren v. Bd. of Selectmen of Town of Amherst*, 519 F.2d 1364, 1366-67 (1st Cir. 1975) ("*Walgren II*").

District courts considering the question have reached the same conclusion. Most relevant to this case, a district court addressing a Twenty-Sixth Amendment challenge to a Tennessee law prohibiting student IDs from being used to vote—exactly like H.B. 340 and H.B. 124—held that the law was "not an abridgment of the right to vote" because refusing to allow student IDs does not "impose[] a severe burden or otherwise abridge[] their right to vote." *Nashville Student Org. Comm. v. Hargett*, 155 F. Supp. 3d 749, 757 (M.D. Tenn. 2015); *see also Johnson v. Waller Cnty.*, 593 F. Supp. 3d 540, 617 (S.D. Tex. 2022) (shorter early voting hours on college campus imposes only minor "inconvenience").[14]

## C.    H.B. 340 and H.B. 124 do not impose a "material" impediment to voting.

Here, H.B. 340 and H.B. 124 are neither a denial nor abridgment of the right to vote under the Twenty-Sixth Amendment.

Plainly, the laws do not *deny* voting privileges to anyone. All otherwise eligible citizens can register and vote so long as they possess a driver's license, passport, tribal identification card, concealed carry license, or—importantly—a no-fee identification

---

[14] Other district court cases have rejected Twenty-Sixth Amendment claims for lack of intent without addressing materiality. *N.C. State Conf. of the NAACP v. McCrory*, 182 F. Supp. 3d 320, 522 (M.D.N.C. 2016) (voter identification law), *rev'd on other grounds*, 831 F.3d 204; *Lee v. Va. State Bd. of Elections*, 188 F. Supp. 3d 577, 610 (E.D. Va. 2016) (same), *aff'd*, 843 F.3d 592; *but see League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1221 & n.16 (N.D. Fla. 2018) (not considering whether removal of early voting sites on college campuses was material because parties agreed that *Arlington Heights* framework governed).

card. Idaho Code §§ 34-411(3), 34-1113, 49-2444(22). Nobody is "absolutely prohibit[ed]" from voting by H.B. 340 or H.B. 124, *Tex. Democratic Party*, 978 F.3d at 188 (quoting *Goosby v. Osser*, 409 U.S. 512, 521 (1973)), and to the extent any person is unable to vote on election day, "if their plight can be characterized as disenfranchisement at all, it was not caused by [H.B. 340 or H.B. 124], but by their own failure to take timely steps to" secure a proper form of identification. *Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973).

The laws do not *abridge* anyone's right to vote either because they do not impose a material impediment to voting. To be clear, all voters are subject to the same requirements, and the only voters who could experience *any* burden due to H.B. 340 and H.B. 124 are those who possess only a student ID, have no Idaho-issued identification, and are not already registered. Considering only 104 voters total across 30 Idaho counties (59 of which were young voters) voted with a student ID in 2022—less than 0.5% of young voters and less than 0.02% of all voters, SER-19-21—there is strong reason to believe the number of affected individuals year over year will be slight. Regardless, once H.B. 340 and H.B. 124 took effect, all any affected individual needed to do to be able to vote was—at some point over the sixteen months between H.B. 340 taking effect and the November 2024 election—gather the required documents, travel to the DMV, and fill out an application for a no-fee identification. This is a minor inconvenience, not a material burden.

Indeed, the Supreme Court agrees that the trouble of securing a no-fee identification card from the State is minimal. In *Crawford v. Marion County Election Board*, the Court upheld a law requiring a photo identification to vote, where the State "offer[ed] free photo identification to qualified voters." 553 U.S. at 186. In applying the Fourteenth Amendment's *Anderson-Burdick* balancing framework for election regulations, the plurality reasoned that "the inconvenience of making a trip to the [DMV], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." *Id.* at 198. The concurring opinion of three justices likewise concluded that "[t]he burden of acquiring, possessing, and showing a free photo identification is simply not severe." *Id.* at 209 (Scalia, J., concurring).

*Crawford*'s analysis should end the matter. Its holding that the burden of obtaining a free identification is non-"substantial" and non-"severe" in the Fourteenth Amendment context is easily adaptable to the Twenty-Sixth Amendment's material-burden requirement. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 669, 678, 689 (2021) (relying on *Crawford* to reject claim of "abridgement" of right to vote under § 2 of the Voting Rights Act, concluding that "[h]aving to identify one's own polling place and then travel there" and "going to a mailbox, a post office, an early ballot drop box" to submit a ballot "fall[] squarely within the heartland of the 'usual burdens of

voting'").[15] The only other court to address a Twenty-Sixth Amendment challenge to a state law eliminating student IDs as an acceptable form of voter identification relied on *Crawford* to conclude that there was no "severe burden." *Nashville Student Org. Comm.*, 155 F. Supp. 3d at 757-58.

However, it's also worth contextualizing the minor inconvenience of obtaining a no-fee identification card before voting. Historically, registering to vote in Idaho has almost always entailed *some* in-person visit—usually to take an oath before a registrar. *See* 1890-91 Idaho Sess. Laws at 69-70. So requiring voters with only a student ID to travel to the DMV to get a photo identification (after which they can register online) truly is nothing more than a "usual burden[] of voting" in Idaho. *Crawford*, 553 U.S. at 198.

Indeed, traveling to the DMV to get a photo identification is *still* the usual burden of voting in Idaho, since all voters are required to secure a qualifying photo identification to vote. SER-21 (99% of Idahoans across all ages use a driver's license to vote). In that sense, removing the student ID option cannot be an abridgement because it imposes no extra burden at all on young voting students—they may have previously been exempted from having to visit the DMV, but now they are in line with the rest of the electorate. *Tully II*, 78 F.4th at 387 (whether a law "renders the Plaintiffs 'worse off,'

---

[15] The Supreme Court has not decided whether an "abridgement" of the right to vote is the same under Section 2 of the Voting Rights Act (VRA) and the Fifteenth Amendment. *Brnovich*, 594 U.S. at 667; *Tully II*, 78 F.4th at 386 n.7.

is *not* the equivalent of asking whether their right to vote has been abridged"). Properly viewed, the plaintiffs here are really seeking special treatment for young voters (vis-à-vis students), not equal treatment.

In any event, Idaho has made voting today easier than ever for all its citizens. It has adopted voting conveniences that not all (or sometimes even most) other States have embraced, including early voting, no-excuse absentee voting, same-day registration, and online registration. *See supra*, Background Section I.[16] It has enacted simple, uniform identification requirements for registering and voting that it has prominently published online.[17] The necessary identification can be obtained free of charge any time before voting—a voter could even apply for a no-fee identification card and early vote the same day and sometimes in the same building. SER-105 (temporary identification can be used to vote).[18]

It is impossible to make voting costless—"voting necessarily requires some effort and compliance with some rules." *Brnovich*, 594 U.S. at 669. But to claim that a

---

[16] *Same-Day Voter Registration*, National Conference of State Legislators (Oct. 25, 2024), https://tinyurl.com/4h82hnx3 (less than half of States offer same-day registration); *Table 1: States with No-Excuse Absentee Voting*, National Conference of State Legislators (Dec. 20, 2023), https://tinyurl.com/24bu22cc (States with no-excuse absentee ballots).

[17] Registering to Vote, Vote Idaho, https://tinyurl.com/y4545dss, (last visited Apr. 9, 2025).

[18] CBS2 News Staff, *Early voting opens in Ada County*, Idaho News (Oct. 15, 2024), https://tinyurl.com/ny3tbt7c (listing 400 N. Benjamin Ln.—which also houses a DMV—as an early voting location).

law requiring a few individuals to visit the DMV makes voting "dramatically harder" to vote is, frankly, dramatic. Opening Br. at 1; *see also* Dkt. 27 at 8 (*amici* insisting that "these laws foreclose the franchise *no less than express prohibitions*") (emphasis added).

### D. The plaintiffs' counterarguments are meritless.

The plaintiffs do not actually attempt to argue that H.B. 340 and H.B. 124 impose a material burden on young voters' right to vote—sensibly so. Instead, they argue (at 27-32) that there is no materiality requirement to begin with. That argument is wrong.

*First*, the plaintiffs argue from snippets of case law (at 24-28) that the Twenty-Sixth Amendment—and other amendments using the same language—prohibit *any* unequally placed burdens, no matter how small. *But see Crawford*, 553 U.S. at 208 (Scalia, J., concurring) ("Very few new election regulations improve everyone's lot"). Yet the cases the plaintiffs quote *foreclose* their argument.

- *Lane v. Wilson* says that the Fifteenth Amendment prohibits "inequality of treatment," but clarifies that the unequal treatment must result from "*onerous* procedural requirements which *effectively handicap* exercise of the franchise" to constitute an "abridgement." 307 U.S. at 274-75 (emphases added).

- *Walgren I* says that the Twenty-Sixth Amendment essentially made age a "specially protected group[], at least for voting-related purposes," but states repeatedly in the same paragraph that an "abridgement" of that group's rights occurs only if a law imposes a burden on voting that is "not insignificant." 482 F.2d at 102.

- The plurality in *City of Mobile v. Bolden* explains that the Fifteenth Amendment is an "exemption from discrimination," but rejects a claim that certain election regulations diluted black voters' voting strength, explaining that there had been no "hindrance" to voting. 446 U.S. 55, 61-65 (1980).

On the flip side, the plaintiffs cannot distinguish the cases on which the district court relied. They suggest (at 30) that *Harman* cannot mean that only material burdens abridge the right to vote because the poll tax invalidated there was only $1.50. 380 U.S. at 530-31. But the Court did not say the *tax* was a material burden; it said that the *certificate of residency* required for failing to pay the tax was a "material requirement." *See Gonzalez*, 677 F.3d at 408 (explaining the case). That tracks the language of the Twenty-Fourth Amendment, which prohibits the right to vote from being "denied or abridged … by reason of failure to pay *any* poll tax." (emphasis added).

Nor is the Seventh Circuit's decision in *Tully II* distinguishable as plaintiffs suggest (at 31-32). The plaintiffs assert that the Twenty-Sixth Amendment claim there failed because the law conferred an extra benefit (absentee voting for seniors only), not a burden. But the Seventh Circuit explicitly declined ruling on that basis like the Fifth Circuit had done under similar facts, *see Tex. Democratic Party*, 978 F.3d at 192, and concluded instead that the law imposed no "material burden" on "other citizens" by requiring them to vote in person. 78 F.4th at 387-88 & n.8.

*Second*, plaintiffs argue (at 29-30) that the Twenty-Sixth Amendment would be superfluous unless it prohibits all differential treatment. Not so. For starters, the Amendment has already accomplished its primary purpose of lowering the voting age in all elections nationwide to 18 years old.

But even with respect to claims like the plaintiffs', a Twenty-Sixth Amendment prohibiting only material burdens on the right to vote based on age is not superfluous

of the Fourteenth Amendment. The Equal Protection Clause generally subjects age-based classifications to rational basis review because age is "not a suspect classification," *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000), and the general *Anderson-Burdick* framework for scrutinizing election laws imposes a "sliding scale test" balancing the burden on voting and the state's interest. *Mecinas v. Hobbs*, 30 F.4th 890, 904 (9th Cir. 2022). Whatever the test for intent under the Twenty-Sixth Amendment, *see infra*, it is the only constitutional amendment that is expressly solicitous about age-motivated distinctions, whereas a court applying the Fourteenth Amendment could very well conclude that age-related reasons justify imposing material hurdles to voting.

*Third*, MFOL argues (at 27-28) that if the Twenty-Sixth Amendment prohibits only placing material burdens in voting, then a State could draw distinctions in election law based on race or sex that selectively impose minor burdens without running afoul of the Fifteenth or Nineteenth Amendments. But the Court can rest easy knowing its decision will not green-light laws "allow[ing] only white men to cast absentee ballots," Opening Br. at 27—no "compelling" interest could possibly justify such a law, so it would obviously be prohibited by the Fourteenth Amendment. *Mecinas*, 30 F.4th at 904; *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). And in any event, the Court need not decide whether the Twenty-Sixth Amendment tracks the Fifteenth and Nineteenth exactly. *Lee*, 843 F.3d at 607 (declining to decide that question).

*     *     *

"It is beyond cavil that voting is of the most fundamental significance under our constitutional structure." *Burdick*, 504 U.S. at 433 (1992) (cleaned up). And States "must play an active role in structuring elections" to ensure that the right to vote can be exercised with "some sort of order." *Id.* This case is a prime example of an attempt to "tie the hands" of a State "seeking to assure that elections are operated equitably and efficiently" by subjecting innocuous elections laws to a full-scale investigation into alleged secret legislative motivations, *id.*—Idaho has been litigating for years, complete with motions, document production, and depositions, over laws requiring minimal efforts from a limited number of voters, none of whom have been identified.

Fortunately, the Twenty-Sixth Amendment builds the necessary breathing room into its text by prohibiting only abridgements (i.e., material impediments) of the right to vote. And having to use an official identification from the State instead of a student ID printed by a school photographer is simply not a material impediment. *See* SER-77.

## III. H.B. 340 and H.B. 124 Were Not Enacted on Account of Age.

If the Court agrees that the right to vote is abridged for purposes of the Twenty-Sixth Amendment only by the imposition of a material burden, and that H.B. 340 and H.B. 124 do not impose a material burden, then the Court need not address the remainder of the plaintiffs' arguments regarding the Legislature's intent. However, the Court should affirm even if it does reach intent.

It is "far from clear" whether the *Arlington Heights* framework that plaintiffs advocate for should guide the Court's inquiry into intent. *Lee*, 843 F.3d at 607. That test

was designed to root out discrimination on the basis of race, which—unlike age—is "so seldom relevant to the achievement of any legitimate state interest" and has a "history of purposeful unequal treatment" raising the baseline level of suspicion of legislative motives. *Kimel*, 528 U.S. at 83 (cleaned up).

Whatever the precise test, the plaintiffs would need enough evidence to show that the Legislature enacted H.B. 340 and H.B. 124 to intentionally abridge young Idahoans' right to vote. "[I]t is not enough to show that the lawmakers had an awareness of the consequences of the legislation for the affected group, that those consequences were foreseeable, or that the legislature acted with indifference to the effect on that group." *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1139 (9th Cir. 2023) (cleaned up).

Moreover, the plaintiffs' "evidence must be considered in light of the strong presumption of good faith on the part of legislators." *Id.* at 1140 (cleaned up). That presumption reflects the "Federal Judiciary's due respect for the judgment of state legislatures," and keeps courts from rushing to "hurl [] accusations at the political branches." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 11 (2024). Generally, if the evidence does not "rule[] out th[e] possibility" that the legislature acted for a permissible purpose, then "that possibility is dispositive." *Id.* at 20.

Even at summary judgment, the plaintiffs' evidence is minuscule—nowhere near enough to overcome the presumption of good faith at some future bench trial. ER-143 (no jury demand).

45

### A. The Legislature had legitimate purposes to enact H.B. 340 and H.B. 124.

The Legislature's purposes in enacting H.B. 340 and H.B. 124 are clear and legitimate.

*First*, the Legislature wanted to "bring greater uniformity to voter registration administration." SER-27. Before 2023, each method of registration—via mail, in person, online, or on election day—accepted a distinct set of identification documents, and none matched the list of documents that could be used to prove identity when voting. Idaho Code §§ 34-407, 34-408A, 34-409, 34-410, 34-411, 34-1114 (2022). By creating a single list of reliable identification documents that would apply equally to all voters in all electoral situations, H.B. 340 and H.B. 124 bring "clari[t]y" and "uniformity" to Idaho's election laws and make voting easier. H.B. 340 Statement of Purpose; SER-63, 66.

*Second*, the Legislature wanted to "protect the integrity of the election process" and prevent election fraud. SER-27. Student IDs lack basic standards for "uniformity," "sophistication," and security. H.B. 124 Statement of Purpose. The process for obtaining one varies from school to school—some schools allow students to use their preferred name or nickname, some allow students to upload their own photo, and some don't ask students to show any government-issued identification when they obtain their student ID and print a "Not for Official Identification" disclaimer on the card. SER-70, 81, 85, 86, 89, 94. These drawbacks present risks that someone may print their own

46

student ID, obtain one under a false name and vote as somebody else, or register and vote twice.

The Legislature's two goals are perfectly permissible. "A State indisputably has a compelling interest in preserving the integrity of its election process." *Brnovich*, 594 U.S. at 685. Moreover, "public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Crawford*, 553 U.S. at 197 (plurality). And it is "practically self-evidently" true that implementing a measure designed to prevent voter fraud would instill public confidence. *Ohio Democratic Party v. Husted*, 834 F.3d 620, 633 (6th Cir. 2016). Refusing to accept student IDs for voting when a citizen couldn't use one "to get on an airplane, buy tobacco, [or] buy alcohol" is a testament to the seriousness with which Idaho regards the integrity of its elections. House State Affairs Committee Meeting, Rep. Tina Lambert, at 1:02-29 (Feb. 16, 2023), https://tinyurl.com/2p9rn4he (filters MeetingYear:2023, Category: House Standing Committee, Committee: State Affairs).

And Idaho is not alone in concluding that student IDs are not reliable enough for electoral use. Several other states do not allow student IDs as acceptable voter identification out of "concerns about preventing voter identification fraud" and

"concerns [about] false student identification cards." *Nashville Student Org. Comm.*, 155 F. Supp. 3d at 752 (describing legislative history).[19]

The plaintiffs' primary response (at 46) is that the Legislature's rationales must be pretextual because there is no evidence of previous "instances of voter fraud" using student IDs in Idaho. But it's still possible such fraud has occurred and gone undetected.

More importantly, even without any "evidence of fraud," "it should go without saying that a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders." *Brnovich*, 594 U.S. at 686; *Crawford*, 553 U.S. at 194-96 (plurality) (crediting State's interest of preventing fraud—even though "[t]he record contains no evidence of any such fraud actually occurring"—because "the risk of voter fraud [is] real" and "it could affect the outcome of a close election"). "[A] State's political system [need not] sustain some level of damage before the legislature [can] take corrective action." *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986).

In other words, in the same way you don't have to wait for your house to be burglarized before installing a security system, States are "permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively." *Id.*

---

[19] *E.g.*, Tenn. Code § 2-7-112; N.D. Cent. Code § 16.1-01-04.1; Ohio Rev. Code § 3501.01; S.C. Code § 7-13-710; Tex. Elec. Code § 63.0101.

The plaintiffs' only other response to these legitimate interests (at 44-45) is to criticize the district court for citing the statements of purpose accompanying the laws. True enough, the statements disclaim that they are not "intended as an expression of legislative intent." Statement of Purpose H.B. 124. But the same could be said of everything the plaintiffs have attempted to rope into their legislative-intent argument— the statements of purpose must be *at least* as probative of legislative intent as internal emails, for example. Opening Br. at 38. In any event, the purposes of creating uniformity and preventing fraud are self-evident on the face of the laws and confirmed by record evidence and legislative history. SER-27, 63, 66.[20]

*      *      *

"While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear." *Crawford*, 553 U.S. at 196 (plurality). The plaintiffs may not like the means Idaho chose to secure its elections against fraud and promote uniformity and may have preferred that the State incur the

---

[20] *See* Senate State Affairs Committee Meeting, Testimony of Phil McGrane, at 27:57-28:19 (Feb. 24, 2023), https://tinyurl.com/2p9rn4he (filters MeetingYear:2023, Category: Senate Standing Committee, Committee: State Affairs) ("[R]eally, what it boils down to with the student ID, is really a very different standard that we produce student IDs than all the other forms of identification that are listed"); *Id.*, Senator Scott Herndon, at 12:04-30, 13:45-15:02 ("the goal of this legislation, House Bill 124, is to protect election integrity … we don't have any guarantee of the uniformity of how [student IDs] are issued"); House State Affairs Committee Meeting, Rep. Tina Lambert, at 1:02-09 (Feb. 16, 2023) ("The problem with using student ID to prove identity when voting is that those cards are particularly insecure").

cost of overhauling schools' student ID standards. Opening Br. at 46-47. But there can be no dispute that Idaho was within its rights to pursue those goals and that it has discretion to decide how to do so. *Burdick*, 504 U.S. at 433 (rejecting narrow tailoring requirement); *see Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1028 (9th Cir. 2016) (upholding election law notwithstanding availability of alternative).

## B. The plaintiffs present no meaningful evidence of intent.

Against all this, and even after discovery, the plaintiffs have no meaningful evidence showing an intent to abridge young voters' right to vote. Because no factfinder could "rule[] out th[e] possibility" that the Legislature acted for a permissible purpose based on the plaintiffs' evidence, the Court should affirm. *Alexander*, 602 U.S. at 20.

First, the plaintiffs rely (at 39-40) on disparate impact—students are more likely to be young, and therefore more likely to be affected by H.B. 340 and H.B. 124. But disparate impact is not enough to show intent. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 260 (1979) ("[I]mpact must be traced to a purpose to discriminate"). The evidence of disparate impact here is slight anyways—data collected from 2022 shows that 59 voters between 18-24 years old and 45 voters older than 25 used a student ID to vote (a difference of *14 voters*), and the plaintiffs have given no reason to suggest the

proportion would be different with more data. SER-19; *see Brnovich*, 594 U.S. at 671 ("very small differences" are weak evidence of discrimination); ER-20.[21]

Next, the plaintiffs mention (at 37-39) that two legislators felt strongly about preventing student IDs from being used to verify identity. That's no bombshell—that's just one of the main things that H.B. 340 and H.B. 124 accomplished. So it's unsurprising that one legislator thought student IDs were "a big issue." ER-66. And the fact that a legislator in committee leadership felt strongly enough to delay a vote on H.B. 340 (creating uniformity in registration) until H.B. 124 (eliminating student IDs to verify identity at the polls) was passed shows only that this legislator cared more about the student ID issue than the uniformity issue. Neither fact shows any animus against young voters.

Similarly irrelevant is evidence suggesting that the law's fraud-prevention aim was intended to prevent *non-residents* from voting. This is simply the wrong type of evidence—even assuming students are disproportionately from out of state, the plaintiffs would still need evidence of intent to discriminate against youth "for its own

---

[21] *Amici* cite a news article reporting that the number of young voters registered in Idaho dropped slightly "between the 2020 general election and *September* 2024." Dkt. 27 at 12 (emphasis added). But that's because young voters move to the next age bracket between elections, or are removed from the registration rolls if they do not vote in two consecutive elections. After processing registrations from October and November 2024—including election day registrations, which skewed towards young voters— young voter registration has returned to 2020 levels. *See Election Results*, Vote Idaho, https://tinyurl.com/ypkrdn4s (scroll to "Historical Registration & Turnout," click "Registration by Age").

sake." *Alexander*, 602 U.S. at 10. The plaintiffs therefore prove nothing with a statement from the Idaho Administration and Elections website (not controlled by the Legislature) warning students—who often return to their home state upon graduation and do not intend to remain in Idaho—that selecting a residence is a "serious matter" requiring "proper reflection." ER-49-50.[22]

Besides, it cannot be disputed that Idaho "has an important state interest in prohibiting voters from voting in locations where they do not reside." *Common Cause/N.Y. v. Brehm*, 432 F. Supp. 3d 285, 316 (S.D.N.Y. 2020). Despite Idaho officials' best efforts to apprise the electorate of the voting requirements, some new residents may be unable to vote on election day due to their "failure to take timely steps" to secure a proper form of identification. *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1189 (9th Cir. 2021) (cleaned up). But that risk falls equally on new-resident voters of all ages. *See* Dkt 27 at 12-13 (*amici* citing news articles suggesting that some "students" and "older voters" did not timely secure proper identification to vote).

The plaintiffs also complain (at 38-39) of several supposed "procedural irregularities," but point to nothing particularly irregular or incriminating. Beyond the typical "sausage-making of political compromise," *Fowler Packing Co., Inc. v. Lanier*, 844

---

[22] *See also* Dkt 27 at 5 (*amici* quoting legislator's comment that students who do not have "a vested interest … in living here" should not vote in Idaho); *id.* at 9 & n.7 (same legislator observed that H.B. 340 and H.B. 124 "did exactly what [they were] intended to do"—after explaining that "the intent behind those laws was to ensure" that voters "are [] Idaho resident[s] and making sure that we know who is voting").

F.3d 809, 815 n.3 (9th Cir. 2016), the only irregularity the plaintiffs mention is that a committee chair expressed his objection to a bill off the record. But that has nothing to do with age discrimination—his objection was about whether out-of-state-issued identifications should be accepted to verify identity. ER-74.

The *only* evidence the plaintiffs present relevant to age *at all* (at 35-37) is about a completely different proposal. The Legislature also considered eliminating the option for registered voters to verify identity at the polls by signing an affidavit but chose not to, and at least some legislators expressed concerned about the consequences of that proposal for the elderly. The plaintiffs argue that this shows the Legislature was "specifically interested in age-based voting patterns." Opening Br. at 35.

Nothing about retaining the affidavit is relevant to the plaintiffs' claim. For starters, it's entirely unclear the extent to which the retention was motivated by assisting elderly voters. One legislator who was "extremely interested in every single aspect of elections" asked for an age breakdown (among other things) of affidavit usage, but that breakdown revealed only minimal additional affidavit usage by the elderly, ER-79, and the request shows only an "awareness of the consequences of the legislation," not intent. *Carrillo-Lopez*, 68 F.4th at 1139 (cleaned up). Two legislators noted that the affidavit would help "elderly" voters who no longer "have any additional photo ID," Opening Br. at 36-37, but "the statements of a handful of lawmakers may not be probative of the intent of the legislature as a whole." *Carrillo-Lopez*, 68 F.4th at 1140.

But more fundamentally, eliminating the affidavit is simply a different proposal with completely different costs and benefits. Affidavits pose fewer risks because "the person ha[s] already previously shown identification at the time they registered to vote." SER-60. The reduced risk profile would justify continuing to accommodate elderly voters given the "special barriers" they face in traveling to the DMV or polls. *Tully II*, 78 F.4th at 387 (absentee voting). So even if that were the Legislature's intent, that's wholly uninformative as to why it did not allow student IDs to be used to verify identity. It can't possibly be that a legislature that intentionally makes one age-based distinction thereafter intends all other disparate impacts on the basis age. *Cf. Abbott v. Perez*, 585 U.S. 579, 603 (2018) ("the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination").

*    *    *

The only other evidence the plaintiffs offer is the "broader context" of a handful of other actions they deem discriminatory—one of which does not even involve the right age group. Opening Br. at 40-41 (exclusion of minors *under 18* from speaking at a hearing). With nothing specific to H.B. 340 and H.B. 124, and with every indication those laws were intended to further legitimate purposes, every rational factfinder would conclude that the presumption of good faith holds.

## CONCLUSION

The Court should affirm the district court's judgment, or should dismiss for lack of standing.

54

Dated: April 23, 2025                              Respectfully submitted,


RAÚL R. LABRADOR
ATTORNEY GENERAL

/s/    *Michael A. Zarian*

ALAN M. HURST
Solicitor General


MICHAEL A. ZARIAN
Deputy Solicitor General


AARON M. GREEN
Deputy Attorney General

*Counsel for Appellee*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief contains 13,996 words, excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6). I certify that this brief complies with the word limit of Cir. R. 32-1.

/s/     *Michael A. Zarian*
Michael A. Zarian

## CERTIFICATE OF SERVICE

I certify that on April 23, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system, which will accomplish service on counsel for all parties through the Court's electronic filing system.


/s/    *Michael A. Zarian*
Michael A. Zarian